No. 103,272

STATE OF KANSAS, *Appellee*, v. DRAKE ANDREW KETTLER, JR., *Appellant*.
(325 P.3d 1075)

Opinion filed May 23, 2014.

*Nancy Ogle*, of Ogle Law Office, L.L.C., of Wichita, argued the cause and was on the brief for appellant.

*Jodi E. Litfin*, assistant district attorney, argued the cause, and *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Drake Andrew Kettler, Jr., appeals his convictions for the premeditated first-degree murder of James Earl Dyer, Jr.; conspiracy to commit first-degree murder; and criminal possession of a firearm. Kettler raises four issues: (1) The State's exercise of peremptory challenges to strike African-Americans from the jury panel violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986); (2) there was insufficient evidence of premeditation on the part of Kettler to support his conviction for premeditated first-degree murder; (3) there was insufficient evidence of an agreement between Kettler and his codefendants to support his conviction for conspiracy to commit first-degree murder; and (4) the prosecutor committed misconduct during closing argument by misstating the legal definition of "premeditation" and thereby deprived Kettler of a fair trial.

While we agree with Kettler that the prosecutor misstated the legal definition of premeditation, we conclude this misstatement did not deprive Kettler of a fair trial. We do not find merit in any of his other arguments, and we affirm.

## FACTS AND PROCEDURAL BACKGROUND

Dyer died from gunshot wounds he suffered on August 10, 2007, in Topeka. Kettler and three other individuals—Corky A. Williams; Kelvin Phillips, Jr.; and Antonio Armstrong—were charged with and convicted of crimes related to the death. All four defendants appealed, and their individual appeals were argued the same day. For these related opinions, see *State v. Williams*, 299 Kan. 509, 324 P.3d 1078 (2014); *State v. Phillips*, 299 Kan. 479, 325 P.3d 1095 (2014); and *State v. Armstrong*, 299 Kan. 405, 324 P.3d 1052 (2014).

The appeals of Williams, Kettler, and Phillips, who were tried jointly, raise many of the same issues. Consequently, our opinions in these cases are largely repetitive. We have followed this format for the ease of reading only one opinion; the reader will not need to refer to multiple opinions. For the benefit of anyone who wishes to read all three opinions, we offer as a guide that Williams asserted the most issues. Kettler and Phillips repeated some of those issues, making either identical or substantially similar arguments. Phillips does, however, present an issue not raised by Kettler or Williams— his first issue, which relates to the procedure for declaring a mistrial. Also, although Williams, Kettler, and Phillips all raise issues regarding the sufficiency of the evidence and the prosecutor's misstatement of the definition of "premeditation" during the closing argument, there is some variance in the analysis because of each individual's role in the shooting of Dyer. The decision in Armstrong's appeal does not have the same level of overlap, and some factual details differ because of the variance in the evidence in his separate trial.

### Procedural History

The charges against the four defendants were not identical. Kettler, like Phillips and Williams, was charged with premeditated

first-degree murder, in violation of K.S.A. 21-3401(a); conspiracy to commit first-degree murder, in violation of K.S.A. 21-3302 and K.S.A. 21-3401; and criminal possession of a firearm, in violation of K.S.A. 21-4204(a)(4)(A). Armstrong was also charged with premeditated first-degree murder and criminal possession of a firearm.

Armstrong's case took a different procedural track when, before any of the defendants' preliminary hearings, he decided to cooperate with the State in exchange for a favorable plea agreement. Initially, in Armstrong's first contact with investigating law enforcement officers, he denied any knowledge of or involvement in the shooting. Later, in his attempt to obtain the plea agreement, he gave a sworn deposition-style statement to the district attorney in which he incriminated himself and implicated the three other defendants in the premeditated killing of Dyer. Based on this statement and as part of Armstrong's plea arrangement, the State called Armstrong as a witness at a joint preliminary hearing related to the charges against Williams, Kettler, and Phillips. Armstrong reiterated the truthfulness of his sworn statement and testified that he had joined with Williams, Kettler, and Phillips in a plan to find and shoot Dyer.

Before Williams, Kettler, and Phillips were brought to trial, Armstrong changed his mind about cooperating with the State and recanted his statements and testimony, even though he lost his plea deal. In a notarized affidavit drafted by Armstrong, he stated that his former defense counsel coerced him into making his prior statements implicating his friends.

Subsequently, Armstrong's case was joined with the cases of Williams, Kettler, and Phillips for the purposes of a jury trial. The resulting joint trial ended with a hung jury. After the first trial, the trial court severed Armstrong's case from the others, and his second trial took place before the three other codefendants again went to trial. Armstrong testified at his second trial, providing yet another version of how Dyer was shot. Armstrong was convicted of premeditated first-degree murder and criminal possession of a firearm, the only charges brought against him.

The State then called Armstrong to testify at the joint second trial of Williams, Kettler, and Phillips. Armstrong testified that both his sworn statement and his preliminary hearing testimony against the other defendants were untrue. Armstrong explained that he had incriminated his friends because he was led to believe that "my homeboys, my brothers, was testifying on me, which I found out later was a lie." He also told the jury that he had just reiterated a story the prosecutor had fed him. Armstrong's explanation was refuted by Armstrong's attorney, who testified that Armstrong was not told what to say in his sworn statement.

Although Armstrong was called as a witness for the State at the trial of Williams, Kettler, and Phillips, he was declared a hostile witness. During his testimony, Armstrong wore a mask to prevent him from spitting on the law enforcement officers who transported him to the courtroom or on those in the courtroom. He often cursed, and he usually either refused to answer questions or was evasive and claimed he could not remember details. Eventually, on redirect examination, Armstrong became so belligerent and uncooperative with the prosecutor that he was removed from the courtroom.

As this history suggests, the jury was presented with multiple versions of the events that led to Dyer's death. In addition to Armstrong's various renditions of what happened, both Williams and Phillips testified at their second trial and offered slightly different versions of events. Plus, approximately a month before the second joint trial, Phillips proffered the substance of his trial testimony in order to obtain some pretrial evidentiary rulings; the jury would learn that some details included in the proffer differed from Phillips' trial testimony. Kettler chose not to testify. The jury also heard the testimony of several individuals who witnessed some portion of the events, investigated the crimes, or had information about the relationship of Dyer and the defendants. Because Kettler attacks the sufficiency of the evidence against him, we will discuss the evidence in some detail.

*Dyer's Conflict with the Defendants*

Through the testimony of several witnesses—including Williams and Phillips—and Armstrong's sworn statement, the jury learned

of a dispute between Williams and Dyer that occurred several weeks before Dyer's death. During this altercation, an argument escalated and ended with Dyer and his friend, Ryland Patton, robbing Williams at gunpoint. Patton testified that after the robbery, Williams issued a challenge by telephoning and saying, "It's on." Patton's testimony was countered by Williams, who told the jury he had decided just to stay away from Dyer and Patton. He denied that Dyer's death had anything to do with the prior encounter.

In turn, Williams' testimony was contradicted by Armstrong's sworn statement and the preliminary hearing testimony of Armstrong. According to that version of events, Williams told Armstrong and Kettler about the robbery immediately after it happened. The three men decided they would be on the lookout for Dyer and his friends. When Armstrong was asked whether there were any plans made to search for Dyer, Armstrong replied, "No. Just—just when we—when we saw him, shoot him." Armstrong was asked if that agreement would apply "to any of the three of you?" He answered, "Any of us . . . . I'm not going to lie, I wanted to do it because not too—not too long after that, just a couple of days after that . . . somebody shot . . . [a friend's house] and grazed me on my arm." Armstrong believed Dyer and Patton were the shooters.

Phillips did not participate in these discussions because he was in jail. Nevertheless, according to Armstrong, Kettler informed Phillips of the plan by speaking to Phillips in "code" during a telephone conversation. As it turned out, Phillips was released from jail the same day as Dyer was shot. According to Armstrong, Phillips joined in the plan to find and shoot Dyer. Armstrong stated that when they found Dyer, they wanted to "[b]low his head off."

*Phillips Spots Dyer; Other Defendants Join Him*

Within hours of Phillips' release from jail, he spotted Dyer and Dyer's girlfriend, Teri Johnson, outside a liquor store and an adjoining smoke shop. Johnson testified that she and Dyer had walked to the liquor store where they ran into some people they knew, Rhonda Shaw and Leonard Mun. Johnson asked Shaw for a ride, and Shaw agreed. While Shaw shopped, Johnson walked from the liquor store toward Shaw's car. At that point, Phillips ap-

proached Johnson and asked if she was "straight," meaning did she need to buy any drugs. Johnson told him she did not. As Johnson got into the car, where Mun and Dyer were already sitting, Phillips told her to take his phone number and to call if she needed something.

Phillips testified that, after talking to Johnson in front of the liquor store, he talked to Shaw and asked her whether she wanted to purchase some drugs. Shaw indicated she had some money at her house, so she would buy drugs if Phillips stopped by. Phillips told Shaw he would be there within 5 to 10 minutes.

According to Phillips, after Shaw's vehicle pulled away, Phillips called Kettler, and Kettler and Armstrong met him in the alley behind the liquor store and smoke shop. They ran down the alley because Phillips was in a hurry to get to Shaw's house so that another drug dealer would not beat him to the sale. Kettler then called Williams to ask for a ride to Shaw's house.

Williams also testified that Kettler called him and asked Williams to give Kettler, Phillips, and Armstrong a ride to Shaw's house. According to Williams, he had been with Kettler and Armstrong earlier in the day. He explained that he had picked up Kettler, Armstrong, and another friend and they drove around for about 30 minutes. Then, Kettler and Williams installed a CD player in Williams' car, while the others were "sitting around talking." Later, the group went their separate ways until Williams picked up the others to take them to Shaw's house. He explained that he was told the men wanted to go to Shaw's house because she owed Kettler some money and Phillips was going to sell her drugs.

According to Armstrong's sworn statement, Kettler and Williams had picked him up earlier in the day and the three were still together when Phillips called. Like Williams, Armstrong stated that Kettler and Williams had installed a CD player in Williams' car, but Armstrong also indicated that while doing so they had hidden a gun behind the CD player. Armstrong explained, "Like where the CD player is in Oldsmobile Delta's [sic] you can take that whole part out, the whole vent part out and you can fit a nice size gun in there." Armstrong described the hidden gun as a "9 mm Ruger."

There was evidence at the trial suggesting that this gun was later used to shoot Dyer.

Once Williams and Kettler finished installing the CD player, according to Armstrong, the three men began driving around. Phillips called Kettler, and Kettler then told the others that Dyer "is at the smoke shop. Get there. And then [Kettler] opened the vent and pulled a gun out of the vent." Williams drove directly to the alley behind the store, which Armstrong said was merely 30 seconds or so away from where they were. Once they were near the store, Armstrong and Kettler jumped out of the car and started running down the alley. Phillips ran toward them and told them Dyer was on his way to Shaw's house. They turned and ran back toward Williams' car.

The timing of Armstrong's version of events meshes with Johnson's account. She saw Phillips and three or four other people running down the alley behind the liquor store as Shaw drove away.

*Events at Shaw's House, According to Johnson and Mun*

Once Shaw, Mun, Dyer, and Johnson arrived at Shaw's house, they carried beer inside and began hanging out. About 5 to 10 minutes after they sat down, Shaw's home phone rang. Shaw answered the phone and simply said, "Yeah, yeah," and then passed the phone to Mun. According to Mun, there was nobody on the other end, so he hung up. Other evidence suggested that either Phillips or Kettler used Phillips' cell phone to call Shaw to verify whether Dyer was at her house. Mun indicated that shortly after the phone call, Shaw asked Dyer if he was J.D., to which Dyer answered, "Yes."

Within a couple minutes of the phone call, there was a knock at Shaw's front door. Mun walked up to the door and asked, "Who is it?" The person on the other side responded, and Mun told the others it was "Little Man," which was Kettler's nickname. When Dyer heard "Little Man," he jumped up and left the room.

Mun looked out the window and did not initially see anyone. When he opened the door, Mun heard someone coming around the side of the house, asking why he had not answered more quickly. As the man approached Shaw's front door, Mun recog-

nized him as Kettler. Phillips and Armstrong came toward the front door from the side of the house, and the three men ran into the house. Phillips approached Johnson and asked something like, "[W]here's he at, Bitch?" apparently meaning Dyer. Johnson acted like she did not know who Phillips was looking for because she "didn't want [Phillips] to do nothing to [Dyer]." Phillips then turned around and walked out the front door.

Seconds later, Phillips returned to the house. According to Johnson, Kettler and Armstrong were with him, and all three men had guns when they walked past her and moved toward the back of the house. Johnson immediately ran out of the house to get help.

Mun, who remained outside the front door, did not see guns when the group, which, according to him now included Williams, walked into the house the second time. Mun testified that he heard "tussling" and "wrestling" sounds coming from inside Shaw's house. He stepped inside and saw one of the men pick up a drinking glass and glass ashtrays and throw them into the bedroom. Then Mun heard the "pop, pop, pop" sound of gunshots and watched the four men run out of the house. When Mun looked into the bedroom, he saw Dyer lying on the floor, unresponsive.

Meanwhile, Johnson ran to a neighbor's house and knocked on the door. When the neighbor responded, Johnson asked her to call law enforcement. Johnson then heard gunshots, so she ran back to Shaw's house. As she approached, Johnson saw the same men run out of Shaw's house, jump into a brown car, and drive away. This car was later identified as Williams' car.

Johnson went inside Shaw's house and found Dyer lying on the bedroom floor, bleeding and unresponsive. Dyer had been struck by two bullets, one of which entered through his arm and pierced his heart. In addition to the bullet wounds, Dyer suffered head wounds and a bite mark on his left shoulder. An expert opined that Phillips was the probable biter.

The jury did not hear Shaw's versions of events because she had passed away before the first trial, and, as we have noted, Kettler chose not to testify. But, just as Williams, Phillips, and Armstrong provided different versions of what happened before the men got

to Shaw's house, they provided very different accounts of what occurred once they arrived.

*Williams' Version*

According to Williams, he drove over to Shaw's house with Kettler, Phillips, and Armstrong because Shaw owed Kettler money and because Phillips said "he needed to take care of some business over there," meaning a drug deal. When they pulled up at Shaw's house, Williams dropped off the other men. He then drove past the house before turning around and coming back to park. Williams said he was parked about a minute when Kettler came out the front door and got into Williams' car. Then Williams heard gunshots coming from inside Shaw's house. Seconds later, Williams saw Phillips and Armstrong running out of the house. When they got into the car, Williams noticed "a few blood spots" on Phillips' shirt. Williams asked, "What's going on?" but they just told him to "drive off." So Williams drove over to the home of Latoya Austin, Armstrong's girlfriend.

Williams testified that he did not see a gun, but when they went inside Austin's house he heard Austin tell Armstrong to "get that out of here," referring to the gun Armstrong was then holding. Williams saw Armstrong leave the house for a couple minutes, presumably to get rid of the gun. Then Armstrong started talking about what had happened at Shaw's house and indicated that Phillips shot Dyer. Phillips and Armstrong talked about "tussling over the gun" with Dyer. They told Williams that Dyer tried to get the gun from Phillips and Dyer had hopped on Phillips' back.

*Phillips' Version*

Phillips' testimony was consistent with Williams', at least in many respects. According to Phillips, his "whole intention was to go over there [Shaw's house] to bust a serve," which he explained meant to complete a drug sale. Phillips denied having any discussion before arriving at Shaw's house about settling a score with Dyer. In fact, according to Phillips, he did not know about Dyer's robbery of Williams until after Dyer's death. On the way to Shaw's house, Phillips called Shaw to make sure she and Mun were there. Phillips

testified that he did not see any guns and did not know whether Williams had hidden a gun in the dashboard of the car.

Phillips said Kettler went up to Shaw's house first, knocked on the door, and announced that it was "Little Man." Mun, who answered the door, mentioned that Dyer had run out the back. Phillips indicated he was not sure why Mun told them about Dyer. Armstrong then went around the side of the house, and Phillips and Kettler went inside. After Phillips completed his drug sale, Armstrong entered the house and began asking where Dyer was because he had not found Dyer behind the house. Next, Armstrong ran through the house, toward the back rooms, and Johnson stood up and ran out the front door. Phillips testified that he tried to get Armstrong to leave, but then he heard "some tussling" and saw Dyer and Armstrong wrestling over a gun. Phillips did not know who brought the gun to Shaw's house, but he assumed it was Armstrong; he specifically denied carrying a gun into Shaw's house himself.

Phillips told the jury that he was not going to let Dyer hurt his friend, so he tried to break up the fight. When his initial efforts did not work, Phillips started hitting Dyer "in his face area." These efforts did not stop Dyer, so Phillips grabbed an ashtray out of the living room and hit Dyer over the head several times. Phillips also bit Dyer. During this time, according to Phillips, Kettler also tried to break up the fight. At some point, Kettler yelled, " 'Come on, let's get out of here. We didn't come over here for this." Kettler then ran toward the front of the house, and Phillips assumed Kettler left.

As the struggle continued, Dyer dropped the gun. Phillips picked it up, but in the process the gun went off. Phillips ran into the bedroom, and Dyer jumped on his back. This caused Phillips to stumble and "[t]wo shots went off." Phillips broke lose from Dyer, and as Dyer "was falling, I let like two more shots go." Phillips testified that the gun was still in his hand when he got into Williams' car and he threw it on the back seat. When asked whether it was his intention to shoot Dyer, Phillips testified, "No, it wasn't. I had no reason to. I don't believe I would have had a reason. That's not my style."

*Armstrong's Versions*

Armstrong's sworn statement included some of the same details. There were significant differences, however, including his explanation of why the four went to Shaw's house, which was to "[b]low Dyer's head off." He also stated that he had initially carried the gun that had been removed from the dash of Williams' car, but, after the men could not find Dyer in Shaw's backyard, Phillips grabbed the gun from Armstrong and entered the house. Armstrong, Kettler, and Williams followed. The fight initially involved Kettler, Phillips, and Dyer, while Williams stood nearby. During the struggle, Kettler had Dyer briefly subdued, but then Dyer got loose and jumped on Phillips' back. At that point, Armstrong started hitting Dyer's head with a glass ashtray and Dyer fell. After Dyer hit the floor, Phillips "backed up and I [Armstrong] started backing up just to make sure that, you know, . . . wasn't no chance I would get hit by the bullets because I already knew what was about to happen at that split second and that's when [Phillips] just started shooting." Phillips "was shooting to kill, but it was like he was kind of shooting kind of wild . . . like he was just trying to hit him everywhere." After the shots were fired, Phillips ran out of the house. Armstrong followed him and saw Kettler in the kitchen doorway with a knife. Armstrong stated that after the struggle moved from the bathroom to the bedroom, Kettler went to the kitchen. "I guess before he got the knife, [Phillips] shot [Dyer]."

A transcript of Armstrong's testimony from his own, separate trial was also admitted into evidence at the trial of Williams, Kettler, and Phillips. This version of events put yet another spin on the facts. Armstrong indicated that he, Williams, Kettler, and Phillips went to Shaw's house to collect money that Shaw owed to Kettler. After all four men went into the house and Shaw paid Kettler, they heard the sound of a curtain being snatched back and saw Dyer "[come] out [of] the bathroom with a black gun in one hand and a silver gun in the other." Dyer said, "[Y]ou-all drop out," meaning everyone give him their "property." Phillips was able to hit Dyer "so hard that one gun flew out of his hand and hit the wall so hard that the clip fell out of it." Kettler and Phillips "lunged

after the other gun." After wrestling around and after Armstrong hit Dyer on the head with an ashtray, Phillips tried to run away, but Dyer ran after Phillips and "grabbed him by the back of his neck." So Armstrong grabbed Dyer and hit him again three times, causing Dyer to drop to the floor. That is when Phillips "came out of nowhere" and "started shooting" at Dyer. Phillips, Kettler, and Armstrong ran out of the house.

On Armstrong's way out of the house, he saw Williams leaning down to pick up the first gun that Dyer had dropped. He did not see what happened to the gun after that. Williams followed Armstrong out of the house, and the four friends drove away in Williams' car. According to Armstrong, they did not plan to kill Dyer: "We did not go over there intending to kill him. We didn't have a gun to go over there to kill him with. He got shot with his own gun."

*Other Evidence*

In other evidence, jurors heard from some of Shaw's neighbors who described a car that matched the description of Williams' car as being near Shaw's house at the time of the shooting. One couple was following Williams' car through the neighborhood. They reported seeing three men get out of the car and approach Shaw's house; one of the men walked to the door and the others ran around the side of the house, which made the couple suspicious. Meanwhile, the driver pulled forward, turned around, and parked. The description of the driver they provided was consistent with Williams' appearance. After the shooting, another neighbor saw "three or four" men run out of Shaw's house and get into a parked car.

The jurors also heard the testimony of Renee Stewart, who testified that Williams and Kettler came to her house the night Dyer was shot. Based on things that were said, Stewart concluded Williams had shot someone. She reported that he seemed very nervous, and he wiped down a 9 mm pistol and some ammunition and asked her to hide the gun. She later sold the gun for drugs. She also indicated that several days before the shooting she had given Kettler and Williams a ride and Kettler had left a box of 9 mm ammunition in the glove box. Law enforcement officers testified

they found the ammunition as described by Stewart; a few bullets were missing from the box and the ammunition matched the type and brand of the fired bullets recovered from Dyer's body and Shaw's house.

After weighing all the evidence, the jury convicted Kettler of premeditated first-degree murder, conspiracy to commit first-degree murder, and criminal possession of a firearm. Kettler filed a timely appeal, over which this court has jurisdiction under K.S.A. 22-3601(b)(1) (off-grid crime; maximum sentence of life imprisonment imposed).

## BATSON CHALLENGES

Kettler, an African-American, contends that the State's exercise of peremptory challenges to strike African-Americans from the jury panel violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as analyzed in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). He focuses on two prospective jurors, L.S. and R.N., although he notes that at the end of the jury selection process no African-Americans remained on the jury. Kettler contends that the State's proffered reasons for striking prospective jurors such as L.S. and R.N. were pretextual, demonstrating purposeful discrimination, which entitles him to a new trial.

### Standards of Review

In *Batson*, the United States Supreme Court held that the Equal Protection Clause applies to the State's privilege to strike prospective jurors through peremptory challenges. When a *Batson* challenge is asserted, a three-step analysis applies; each step is governed by its own standard of review. *State v. Hill*, 290 Kan. 339, 358, 228 P.3d 1027 (2010); *State v. Pham*, 281 Kan. 1227, 1237, 136 P.3d 919 (2006).

First, the party challenging the strike must make a prima facie showing that the other party exercised a peremptory challenge on the basis of race. Appellate courts utilize plenary or unlimited review over this step. *Hill*, 290 Kan. at 358.

Second, if a prima facie case is established, the burden shifts to the party exercising the strike to articulate a race-neutral reason for striking the prospective juror. This reason must be facially valid, but it does not need to be persuasive or plausible. The reason offered will be deemed race-neutral unless a discriminatory intent is inherent in the explanation. The opponent of the strike continues to bear the burden of persuasion. 290 Kan. at 358.

Third, the trial court must determine whether the objecting party has carried the burden of proving purposeful discrimination. This step hinges on credibility determinations. "[U]sually there is limited evidence on the issue, and the best evidence is often the demeanor of the party exercising the challenge. As such, it falls within the trial court's province to decide, and that decision is reviewed under an abuse of discretion standard. [Citations omitted.]" *State v. McCullough*, 293 Kan. 970, 992, 270 P.3d 1142 (2012).

*Striking of Prospective Jurors and the Trial Court's Rulings*

During the jury selection process, Kettler's codefendant Williams raised a *Batson* challenge to the State's decision to strike L.S. and R.N. Although Kettler did not specifically bring separate *Batson* challenges when the State removed L.S. and R.N., his defense counsel did join with the renewal of Williams' challenges once the jury was chosen and there were no African-Americans left on the jury. Kettler's defense counsel recognized that the defendants had struck two minority prospective jurors from the venire panel but argued that the State's striking of more minority prospective jurors showed a "pattern" of eliminating prospective jurors based on race. Again, despite this characterization of a "pattern" of discrimination during voir dire, Kettler only focuses on two panel members in his appellate brief. Perhaps this is because another minority panel member, R.H., was struck by the State, but Kettler's counsel voiced agreement with the propriety of that strike, even after Williams' counsel objected. Thus, Kettler had essentially agreed to the striking of three minority panel members—two by the defense and one by the State. Consequently, the State was not responsible for striking all minorities.

Like Kettler, we focus solely on L.S. and R.N. With regard to them, the parties do not dispute that the defense established a prima facie case that they were struck based on race. After Williams challenged those strikes, the trial court gave the State the opportunity to respond.

As to L.S., the State explained it was striking L.S. because she was employed as a kitchen supervisor at a correctional facility during the time that one of the witnesses for the prosecution, Stewart, was incarcerated at that facility. The State opined it was possible that L.S. had contact with Stewart and other witnesses and would recognize them when they testified, even though L.S. had not recognized their names.

Williams' defense counsel responded to the State's explanation by arguing that other potential jurors (presumably non-African-Americans) remained on the jury panel despite having had "law enforcement contact with corrections' personnel." But the State then pointed out that L.S. was the *only* potential juror who worked at this particular correctional facility at the same time that a witness in the case was incarcerated there. The trial court found that the defendant failed to carry the burden of proving purposeful discrimination.

As for prospective juror R.N., the race-neutral reason provided by the State was that R.N. indicated on his jury questionnaire that he had pending unpaid traffic tickets; thus, the State argued that R.N. "had some adverse contact with law enforcement." The prosecution further noted that it was trying to eliminate younger individuals lacking in "life experience and/or combination of formal education" and R.N. fit this description. Williams' defense counsel responded, in part, that the existence of "unpaid traffic tickets . . . does not necessarily imply any significant law enforcement contact, [it] implies more inability to pay."

After listening to all the arguments, the trial judge denied the *Batson* challenge regarding R.N., concluding, "I don't believe that the defendant has made or met his burden to show purposeful discrimination based on the fact . . . the State is contending." In addition, the trial judge—when summarizing the rulings regarding all of the challenges, including the additional challenge to R.H.

made by Williams but not joined by Kettler—found "there were race-neutral reasons that those individuals were struck and there was no purposeful discrimination against any of those individuals."

*State Proffered Nondiscriminatory Rulings for Strikes*

In attacking the trial court's ruling on appeal, Kettler maintains that the decision to strike L.S. and R.N. shows purposeful discrimination because L.S. and R.N. exhibited "similar characteristics" to some non-African-American individuals who ultimately served on the jury. This court has stated that the State's failure to strike a white juror with similar characteristics as a stricken minority prospective juror is circumstantial, although not conclusive, evidence of purposeful discrimination. *State v. Trotter*, 280 Kan. 800, 818, 127 P.3d 972 (2006). Conversely, evidence that the State struck minority and nonminority panel members for the same reason can be evidence that a defendant has failed to carry his or her burden of demonstrating purposeful discrimination. See *Miller-El v. Dretke*, 545 U.S. 231, 241, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005); *State v. Angelo*, 287 Kan. 262, 274, 197 P.3d 337 (2008).

Consistent with these authorities, the State pointed out to the trial court that it had struck nonminority panel members for the same reasons it struck R.N.—youthfulness, lack of experience, and potentially negative experiences with law enforcement. In response to this statement, Williams' counsel acknowledged that the defendants had also exercised peremptory challenges to strike other youthful prospective jurors. This concession was sufficient to establish youthfulness and lack of experience as a nondiscriminatory reason for the strike—a reason used by both the State and the defense—even if it could be disputed that R.N. had negative experiences with law enforcement. The additional reason of the traffic tickets does not negate the other nondiscriminatory reasons offered by the State.

Further, even though Kettler contended before the trial court and now on appeal that there were venire members who had similar characteristics that remained on the jury, neither Williams' nor Kettler's counsel made a record adequate for us to rule in Kettler's favor. Kettler did not identify those jurors he felt had similar char-

acteristics. Hence, from the trial record itself, we are unable to analyze Kettler's argument.

Similarly, on appeal, Kettler does not direct this court to any pages in the record supporting his "similar characteristics" assertion. See *McCullough*, 293 Kan. at 999 (appellant's burden to designate a record affirmatively showing error). Appellate courts "will not independently search the record and guess which specific facts [appellant] believes support his general allegations." *State v. Bryant*, 285 Kan. 970, 977, 179 P.3d 1122 (2008); see Rule 6.02(a)(4) (2013 Kan. Ct. R. Annot. 39) ("The court may presume that a factual statement made without a reference to volume and page number has no support in the record on appeal."). Because we are unable to determine if there is factual support for Kettler's position, his arguments regarding the State's decision to strike R.N. fails.

As to the reason given by the State for striking L.S.—that she might know one of the State's witnesses—other courts have recognized that this is a nondiscriminatory reason for exercising a peremptory strike. See, *e.g., United States v. McKay*, 431 F.3d 1085, 1092 (8th Cir. 2005), *cert. denied* 547 U.S. 1174 (2006). We agree; in fact, potential knowledge of a witness is a frequent reason for striking prospective jurors.

In summary, although the elimination of all African-Americans from the jury is very troubling, we note that Kettler's defense counsel recognized that the defense had struck two other minority prospective jurors from the venire panel. This means that Kettler has not established that the State purposefully sought to eliminate *all* minority members of the panel; we simply do not know whether the State would have exercised peremptory challenges to remove the two minority prospective jurors who were removed by the defense. Further, based on the race-neutral reasons articulated by the State for its strikes, we conclude that the trial court did not abuse its discretion in concluding that Kettler failed in his ultimate burden to prove purposeful discrimination during the jury selection process.

## SUFFICIENCY OF THE EVIDENCE

Kettler argues that there was insufficient evidence to support his

convictions for premeditated first-degree murder and conspiracy to commit first-degree murder. With regard to Kettler's murder conviction, he contends the State failed to prove the element of premeditation. As for conspiracy, Kettler argues the State failed to prove that he entered into an agreement with his codefendants to kill Dyer.

The standard of review that applies when sufficiency of the evidence is challenged in a criminal case is well known. After reviewing all the evidence in a light most favorable to the prosecution, the appellate court must be convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *State v. Lowrance*, 298 Kan. 274, 296, 312 P.3d 328 (2013).

*Premeditated First-Degree Murder*

We first apply this standard to Kettler's argument that his conviction for premeditated first-degree murder must be reversed because there was insufficient evidence of premeditation. As Kettler correctly notes, the State proceeded against him on an aiding and abetting theory. To establish guilt on the basis of aiding and abetting, the State had to show that Kettler knowingly associated with the unlawful venture and participated in such a way as to indicate that he was facilitating the success of the venture. See K.S.A. 21-3205(1); *State v. Green*, 280 Kan. 758, 761, 127 P.3d 241, *cert. denied* 549 U.S. 913 (2006). As such, even though Kettler did not personally fire the gun that killed Dyer, the State was required to prove Kettler's intentional participation in the venture, premeditated first-degree murder, which obviously includes the element of premeditation.

Premeditation means to have thought the matter over beforehand and does not necessarily mean an act is planned, contrived, or schemed beforehand; rather, premeditation indicates a time of reflection or deliberation. *State v. Qualls*, 297 Kan. 61, Syl. ¶ 2, 298 P.3d 311 (2013); *State v. Holmes*, 278 Kan. 603, 632, 102 P.3d 406 (2004); see PIK Crim. 3d 56.04(b). Further, it is not necessary that there be direct evidence of either intent or premeditation.

Instead, premeditation, deliberation, and intent may be inferred from the established circumstances of a case, provided the inferences are reasonable. *State v. Scaife*, 286 Kan. 614, 617, 186 P.3d 755 (2008). In other words, "[i]ntent . . . may be shown by circumstantial evidence, and a person is presumed to intend all the natural consequences of his acts. [Citation omitted.]" *State v. Childers*, 222 Kan. 32, 37, 563 P.2d 999 (1977).

In considering circumstantial evidence, Kansas caselaw identifies factors to consider in determining whether the evidence gives rise to an inference of premeditation that include: "(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. [Citation omitted.]" *Scaife*, 286 Kan. at 617-18; see *State v. Marks*, 297 Kan. 131, 140, 298 P.3d 1102 (2013). But the analysis of what inferences can be reasonably drawn is not driven by the number of factors present in a particular case because in some cases one factor alone may be compelling evidence of premeditation. See *State v. Cook*, 286 Kan. 1098, 1102, 191 P.3d 294 (2008); *State v. Morton*, 277 Kan. 575, 582-83, 86 P.3d 535 (2004) (evidence to support second and third factors sufficient in finding premeditation). Use of a deadly weapon by itself, however, is insufficient to establish premeditation. *State v. Cosby*, 293 Kan. 121, 134, 262 P.3d 285 (2011).

### Evidence Was Sufficient

A review of the record shows evidence—both direct and circumstantial—of premeditation. Certainly the strongest evidence of premeditation came from Armstrong's sworn statement, which establishes an agreement between Williams, Kettler, Armstrong, and, later, Phillips to kill Dyer in retribution for his robbing Williams at gunpoint. But there was other evidence of premeditation as well.

Focusing on the first factor traditionally considered as evidence of premeditation—the nature of the murder weapon—Johnson testified the men entered the house with guns. Armstrong explained that a gun had been hidden, removed from its hiding place

before the men got to the liquor store, and then taken with them—specifically, by Phillips—into Shaw's house. Even in Phillips' version of events, he assumed the murder weapon had been brought into the house by Armstrong. Moreover, during the struggle over the gun, there was evidence that Kettler went to Shaw's kitchen to retrieve a knife—an alternative, but deadly, weapon.

As for the second factor regarding lack of provocation, there was no evidence that Dyer did anything on the day of his death to entice Williams, Kettler, Phillips, and Armstrong to enter the house. Under any version of events other than Armstrong's testimony at his own trial, the aggressors were Armstrong, Kettler, and/or Phillips, either individually or together, and Williams aided and abetted their efforts.

Patton provided evidence of the third and fourth factor—the defendants' prior conduct and prior threats and declarations of the defendants before and/or during the occurrence. Patton testified that Williams had issued a challenge to him and Dyer. As to Kettler in particular, there was evidence that he was the one who communicated with Phillips about the plan. Then, on entering Shaw's house, Phillips got in Johnson's face "talkin' about, 'Bitch, where is he?'" Johnson apparently viewed this as a threat because she pretended not to know who Phillips was referring to because she "didn't want [Phillips] to do nothing to [Dyer]." Turning to Kettler's conduct after the shooting, Stewart testified about Williams and Kettler coming to her house the night of the shooting, bringing a 9 mm gun that she believed belonged to Williams, wiping down the gun and ammunition, and asking her to hide it.

Finally, the fifth factor—the dealing of lethal blows after the deceased was felled and rendered helpless—also weighs toward a finding of premeditation. In Armstrong's sworn statement, he indicated he had repeatedly hit Dyer in the head with a glass ashtray, causing Dyer to fall, and then Phillips fired several shots into Dyer as he was lying on the bedroom floor. Armstrong stated that Phillips was "shooting to kill." Forensic evidence confirmed that shots were fired into the floor.

Kettler ignores these factors and the circumstantial and direct evidence against him. Instead, he points to evidence supporting

the defense theory that the only reason he and the others went to Shaw's house was to collect money from Shaw and sell her some drugs. He also emphasizes Phillips' testimony, where he said: "When [Kettler] seen me get the gun off the ground, he started yelling, 'Come on, let's get out of here. We didn't come over here for this. This shit is stupid. Let's get out of here.' " But these statements by Kettler do not necessarily negate the existence of a premeditated agreement to kill Dyer. They could indicate that Kettler did not expect Dyer to struggle and put them at risk.

More significantly, however, the jury heard this evidence supporting Kettler's defense theory, but the jury also heard evidence incriminating Kettler—evidence from which a rational factfinder could conclude that the killing of Dyer was intentional and premeditated. In fact, Kettler basically admits that there was evidence of premeditation (as well as the elements of conspiracy which will be discussed later), but he complains about the weight the jury gave to that evidence. He contends in his appellate brief that "[t]he only evidence supporting premeditation, as well as conspiracy and aiding and abetting, came from Armstrong." More specifically, Kettler contends Armstrong's statements were not credible. He notes that Armstrong had provided varied accounts of what happened on the date of the incident; Armstrong had recanted his accusatory statements against Kettler and the others; and Armstrong displayed uncooperative and belligerent behavior during his testimony at Kettler's trial.

Kettler's argument is not without some factual support; he is correct that there was evidence that could have justified a different verdict than that reached by the jury. Nevertheless, his argument does not have any legal support because to reach the result he requests, this court would have to make our own determination of credibility and reweigh the evidence, and these are not tasks an appellate court performs when conducting a sufficiency review. Instead, an appellate court considers all evidence—even if there is conflicting evidence or reasons to question its credibility—and does so in the light most favorable to the State. See *State v. Raskie*, 293 Kan. 906, 920, 269 P.3d 1268 (2012). Factfinders—in this case the jurors, not appellate judges—make credibility determinations.

Thus, Armstrong's incriminating and accusatory statements are part of our consideration.

Further, the more incriminating versions of events relayed by Armstrong are consistent with other direct and circumstantial evidence, including the testimony of Patton, Johnson, and Mun; the observations of several of Shaw's neighbors; and much of the evidence gathered in the investigation, including videos from cameras at the liquor store, phone records, and the nature and location of Dyer's wounds. See *Scaife*, 286 Kan. 614, Syl. ¶ 3 ("[A] factfinder is permitted to reasonably infer the existence of a material fact from circumstantial evidence, even though the evidence does not exclude every other reasonable conclusion or inference."). During the State's closing argument, the prosecutor spent considerable time detailing the discrepancies between the physical evidence and the defendants' various versions of how the fight played out.

Thus, the evidence from Armstrong's sworn statement is not so incredible that it must be disregarded. See *State v. Brinklow*, 288 Kan. 39, 53-54, 200 P.3d 1225 (2009) (identifying *State v. Matlock*, 233 Kan. 1, 4, 660 P.2d 945 [1983], as "perhaps the only case of its kind in this state where the Supreme Court directly weighed the evidence and assessed the credibility of the prosecutrix," calling *Matlock* "aberrant," and concluding in the case before it "inconsistencies in the evidence did not render [the victim's] testimony . . . so incredible or improbable as to defy belief"); accord *State v. Plunkett*, 261 Kan. 1024, 1033, 934 P.2d 113 (1997).

In summary, various versions of events were presented to the jury through an assortment of witnesses and other evidence. In this mix of testimony, there was sufficient evidence when viewed in the light most favorable to the State that a rational factfinder could have found beyond a reasonable doubt that Kettler and the others premeditated the killing of Dyer.

*Conspiracy to Commit First-Degree Murder*

Kettler next contends that the State provided insufficient evidence that he entered into an agreement to commit a murder to support the conspiracy charge. An agreement is an element of conspiracy, and the jury was instructed that it had to find that Kettler

agreed with others to commit the crime of premeditated first-degree murder. See PIK Crim. 3d 55.03 (conspiracy).

In order to meet the sufficiency of the evidence standard, there must be evidence supporting each element of a crime, such as the agreement element of the conspiracy charge. See K.S.A. 21-3302(a); *State v. Northcutt,* 290 Kan. 224, 231, 224 P.3d 564 (2010); *State v. Webber,* 260 Kan. 263, 288, 918 P.2d 609 (1996), *cert. denied* 519 U.S. 1090 (1997). The existence of an agreement does not need to be proved directly, however. "[I]t is enough if the parties tacitly come to an understanding in regard to the unlawful purpose, and this may be inferred from sufficiently significant circumstances. [Citation omitted.]" *State v. Swafford,* 257 Kan. 1023, 1040, 897 P.2d 1027 (1995); see *State v. Sharp,* 289 Kan. 72, 104-05, 210 P.3d 590 (2009); *State v. Davis,* 284 Kan. 728, 737-38, 163 P.3d 1224 (2007).

Applying these principles, we conclude the record includes evidence of an agreement between Williams, Kettler, Phillips, and Armstrong to shoot and kill Dyer. Armstrong had stated that he had several discussions with Kettler and Williams "about getting" Dyer. It was agreed that "if you see [Dyer], shoot him." Armstrong also stated that although nobody explicitly said, "[W]e got to go kill" Dyer, "[W]e all knew what the goal was when we went over there . . . to kill James Dyer." Additionally, he said that Phillips joined in this agreement. The State aptly argues that the jury could have inferred through Armstrong's statements, the fact Phillips alerted the others to Dyer's whereabouts, and the speed with which the defendants acted once Phillips called them about spotting Dyer, that the foursome had an agreement to kill Dyer.

Kettler does not dispute that Armstrong's statements—his sworn statement and Armstrong's preliminary hearing testimony—offered proof of an agreement. Instead, Kettler again argues that other evidence supported his defense theory.

Once again, Kettler attacks the credibility of Armstrong's incriminating and accusatory statements because of Armstrong's various versions of events and because Armstrong later recanted his sworn statement. It was the jury, however, that had the duty to weigh the evidence and determine the credibility of the witnesses. It was not

bound to accept any one witness' version of the facts; and having convicted Kettler, the jury is presumed to have believed the State's evidence and to have drawn from it all reasonable inferences favorable to the State. See *State v. Aikens*, 261 Kan. 346, 392, 932 P.2d 408 (1997), *rev'd on other grounds by State v. Warrior*, 294 Kan. 484, 277 P.3d 111 (2012); see also *State v. Moody*, 223 Kan. 699, 704-05, 576 P.2d 637 (evidence, which stood or fell on whether jury believed coconspirator who was primary witness against defendant, was sufficient to support defendant's conviction of conspiracy to commit aggravated burglary and aggravated robbery), *cert. denied* 439 U.S. 894 (1978). Further, this court does not reevaluate credibility a jury has already determined. See *State v. Peppers*, 294 Kan. 377, 401, 276 P.3d 148 (2012); *Raskie*, 293 Kan. at 920; *State v. Ward*, 292 Kan. 541, Syl. ¶ 12, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). It is not the function of this court to reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *Lowrance*, 298 Kan. at 296.

The evidence, when viewed in the light most favorable to the prosecution, was sufficient for a rational factfinder to find Kettler guilty of conspiracy to commit first-degree murder.

## PROSECUTORIAL MISCONDUCT

Next, Kettler contends the prosecutor committed misconduct during closing argument by misstating the legal definition of "premeditation" and thereby deprived him of a fair trial. A misstatement of the law during a prosecutor's closing argument can deny a defendant a fair trial when "the facts are such that the jury could have been confused or misled by the statement." *State v. Phillips*, 295 Kan. 929, Syl. ¶ 5, 287 P.3d 245 (2012).

*Standard of Review*

To determine whether a prosecutor committed reversible misconduct, we first decide if the challenged comment exceeded the wide latitude of language and manner afforded the prosecutor when discussing the evidence. If the comment was outside these bounds, we next decide if the comment constitutes reversible error,

which requires a finding that the comment was so prejudicial as to deny the defendant a fair trial. *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 (2013); *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 (20114).

In analyzing the second step of whether the defendant was denied a fair trial, we consider three factors: "(1) whether the misconduct was gross and flagrant; (2) whether it was motivated by prosecutorial ill will; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors." No one factor is controlling. *Bridges*, 297 Kan. at 1012; *Tosh*, 278 Kan. at 93.

Before the third factor can ever override the first two factors, an appellate court must be able to say that the State can meet the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967). *Bridges*, 297 Kan. at 1012 (citing *Tosh*, 278 Kan. at 97). In *Chapman*, the United States Supreme Court directed that a constitutional error can be deemed harmless only if "the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *Ward*, 292 Kan. 541, Syl. ¶ 6. If the error does not violate the United States Constitution, the harmless error analysis is defined in K.S.A. 60-261, and the test is whether "there is a reasonable probability that the error did or will affect the outcome of the trial in light of the entire record." 292 Kan. 541, Syl. ¶ 6.

Even though we have applied this dual harmless error standard, we also have observed that as a practical matter the result of the harmless error evaluation depends on the outcome of the constitutional standard. "[B]oth the constitutional and nonconstitutional error clearly arise from the very same acts and omissions," and the constitutional standard is more rigorous. Thus, the State necessarily meets the lower statutory standard under K.S.A. 60-261 if it meets the higher constitutional standard. See *Bridges*, 297 Kan. at 1015 (citing *State v. Herbel*, 296 Kan. 1101, 1111, 299 P.3d 292 [2013]).

## Alleged Misconduct

Here, the alleged prosecutorial misconduct occurred when the prosecutor was describing the elements of premeditated first-degree murder and stated:

"There are basically three elements to that offense that the State needs to prove to you. First, that the killing of James Dyer, Jr. was done intentionally, that means purposeful, willfully, but not by accident. And we'll get into each one of these and how the evidence applies to these, but I guess in summary, James Dyer did not die by accident. He was intentionally murdered by these individuals. The second . . . is that it was done with premeditation. *What that means is . . . that they thought it over before they went in and did it. That's what premeditation is. There's even an instruction about what does that mean, thought it over, you could think it over, just a half second before you actually fired the fatal shot, that's true,* but that's for you to decide whether or not they thought it over before they actually committed the act.

"Again, I would suggest that the evidence does support the fact that these three, along with Mr. Armstrong, clearly thought over what they were about to do before they went to Rhonda Shaw's house. This was no happenstance. This was no accident. This is something these four individuals thought about as they made their way over to Rhonda Shaw's house. It's the reason they went there, was to get James Dyer." (Emphasis added.)

## Misstatement of Law

Kettler, in an identical argument to the one advanced by codefendants Williams and Phillips, contends that the prosecutor's "half second" description of premeditation is analogous to stating premeditation can be instantaneous—language this court disapproved in *State v. Holmes,* 272 Kan. 491, 33 P.3d 856 (2001). Kettler makes a persuasive point.

In *Holmes,* the victim was shot and killed in a struggle over a gun. The defendant was convicted of premeditated first-degree murder, although there was no evidence of premeditation before the struggle began. During closing argument, the prosecutor stated that " 'premeditation can occur in an instant. That's the law in the State of Kansas.' " 272 Kan. at 497. Then, in rebuttal the prosecutor stated that " 'premeditation can take a second. . . . It can happen in a second.' " 272 Kan. at 497. This court determined that the prosecutor's statements constituted a deliberate misstatement of the law, noting the prosecutor had been cautioned in the jury in-

structions conference before argument began to avoid such comments. Cumulatively, the lack of evidence of premeditation before the struggle began and the deliberate nature of the comments convinced this court that the prosecutor's misconduct created reversible error. 272 Kan. at 499-500.

Consistent with *Holmes*, this court has repeatedly warned prosecutors about going outside of the approved language in PIK Crim. 3d 56.04(b) and making comments that are analogous to stating premeditation can occur in the same instant as the act that results in a death. See, *e.g.*, *State v. Hall*, 292 Kan. 841, 850-52, 257 P.3d 272 (2011) (prosecutor's statement during closing argument that defendant could have formed premeditation after the pull of the first trigger, "because remember, he pulls four times," improperly stated the law and essentially suggested that premeditation could have been formed instantaneously); *State v. Cosby*, 285 Kan. 230, 248, 169 P.3d 1128 (2007) ("We have consistently found reversible misconduct when a prosecutor states or implies that premeditation can be instantaneous."); *State v. Morton*, 277 Kan. 575, 585, 86 P.3d 535 (2004) (reversible error for prosecutor to imply premeditation can be instantaneous, based on closing argument that " '[o]ne squeeze of a trigger is all it takes' "); *State v. Pabst*, 273 Kan. 658, 662, 44 P.3d 1230 ("A discussion of PIK Crim. 3d 56.04[b] in closing argument should avoid any temptation to use a synonym to convey the suggestion of 'an instant' without using the actual phrase."), *cert. denied* 537 U.S. 959 (2002); *State v. Moncla*, 262 Kan. 58, 70-73, 936 P.2d 727 (1997) (adding phrase " 'it may arise in an instant' " to pattern instruction on premeditation was inappropriate; use of such language tended to diminish importance of the element of premeditation).

The State suggests that while the prosecutor's "half second" reference was inartful, the prosecutor was merely trying to convey that the jury *could* find the decision to kill Dyer occurred in half a second, and it was the jury's duty to determine *if* that constituted "thinking it over beforehand." This argument is not persuasive. The prosecutor's statement informed the jury that the "beforehand" period could be a half second. Further, the descriptive term "half second" is obviously a shorter period of time than the " 'in a sec-

ond' " phrase disapproved in *Holmes* and is not significantly different than saying " 'in an instant' " or in a " 'squeeze of a trigger,' " as disapproved in several cases. As in those cases, Kettler's jury could have taken the prosecutor's choice of words as suggesting that premeditation can be instantaneous with the homicidal act. As such, we conclude the prosecutor misstated the law.

*Not Reversible Error*

With prosecutorial misconduct established, it is necessary to determine whether the error requires reversal under the second analytical step. As we have discussed, this requires a harmlessness inquiry using three factors. See *Bridges*, 297 Kan. at 1012.

In assessing the first of these factors of whether gross and flagrant conduct occurred, a misstatement of the law can be considered gross and flagrant, especially if the statement is contrary to a longstanding rule of law. See *State v. Kemble*, 291 Kan. 109, 121-25, 238 P.3d 251 (2010) (factors determining gross and flagrant conduct include repeated comments, emphasis on improper point, planned or calculated statements, violation of a well-established rule, and violation of a rule designed to protect a constitutional right); accord *State v. Brown*, 295 Kan. 181, 214, 284 P.3d 977 (2012). Given our past advice that prosecutors should be especially careful in discussing the meaning of the term "premeditation," we conclude the misconduct was gross and flagrant.

Nevertheless, we do not find evidence of ill will. A prosecutor's ill will is often " 'reflected through deliberate and repeated misconduct.' [Citation omitted.]" *State v. Inkelaar*, 293 Kan. 414, 430, 264 P.3d 81 (2011). These circumstances do not exist in this case. The misstatement was isolated and surrounded by correct statements of law. As shown in the portion of the transcript quoted above, both before and after the reference to the "half second," the prosecutor mentioned correctly that premeditation means "thought it over" beforehand. The prosecutor argued that the evidence showed that Kettler and the others thought over the killing of Dyer before they arrived at Shaw's house. Given the context of the statement, we conclude the prosecutor was not motivated by ill will.

Turning to the third factor, whether the evidence against the defendant was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of the jurors, we conclude there is no reasonable possibility the misstatement affected the verdict. The State's theory of premeditation was that Williams, Kettler, Phillips, and Armstrong went into Shaw's house with the intent to kill Dyer. In fact, immediately upon making the misstatement, the prosecutor said that Kettler and the others went to Shaw's house "to get" Dyer and they thought about getting him on their way from the liquor store to the house. This theme was repeated and emphasized throughout the closing argument. As we have discussed, there was considerable evidence to support this theory, which distinguishes this case from *Holmes*, 272 Kan. at 499-500, where this court reversed a defendant's conviction because of a similar statement. Further, the State did not discuss or emphasize any version of the facts that would suggest any of the defendants premeditated the murder in an instant or a half second.

In addition, the trial court properly instructed the jury on the definition of premeditation and instructed the jury that arguments of counsel were not evidence. Specifically, the trial court gave PIK Crim. 3d 56.04(b) (premeditation) in conjunction with the instruction on first-degree murder prior to the parties' closing arguments. See *State v. Jamison*, 269 Kan. 564, 573, 7 P.3d 1204 (2000) ("Consistent with our past decisions, we conclude that the definition of 'premeditation' in PIK Crim. 3d 56.04[b] adequately conveys the concept that 'premeditation' means something more than the instantaneous, intentional act of taking another's life."). The trial court also gave PIK Crim. 3d 54.05 (responsibility for crimes of another), which informed the jury, in part, that "[a] person who, either before or during it commission, intentionally aids or abets another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed." See K.S.A. 21-3205(1) (discussed previously). Because the evidence suggested that Kettler was not the one who fired the shots at Dyer, the application of this instruction to the facts meant that the jury had to find that the premeditation occurred before Kettler's conspirators began the fight.

Because we presume the jury followed the court's instructions, the court's guidance served to mitigate any potential harm caused by the prosecutor's statements. See *State v. Huddleston*, 298 Kan. 941, 956, 318 P.3d 140 (2014) ("Although these instructions do not give the prosecutor a free pass on misconduct, they are appropriate considerations when evaluating whether a jury was misled."); *State v. Hebert*, 277 Kan. 61, 85, 82 P.3d 470 (2004) (prosecutor's improper comment regarding premeditation was not reversible error when there was no evidence that prosecutor deliberately misstated the law, jury was given proper PIK instruction on premeditation, and jury was told that arguments of counsel were not evidence); *State v. Doyle*, 272 Kan. 1157, 1165-66, 38 P.3d 650 (2002) (no indication prosecutor purposefully misstated the law and evidence of premeditation was strong); *Jamison*, 269 Kan. at 572-73 (prosecutor's misstatement on the law on premeditation was not reversible error when the jury was properly instructed on the law).

In light of the jury instructions, the facts of the case, and the theme of the prosecutor's argument that the premeditation had occurred before Kettler and the others arrived at Shaw's house, we conclude the jury would not have been confused or misled by the prosecutor's misstatement. The State has demonstrated beyond a reasonable doubt that the prosecutor's misstatement did not affect the outcome of the trial and does not require reversal.

Affirmed.