NOT DESIGNATED FOR PUBLICATION

No. 121,298

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.R.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; GREGORY D. KEITH, judge. Opinion filed April 24, 2020. Affirmed in part, reversed in part, and remanded.

*Grant A. Brazill*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for appellant natural father.

*Anita Settle Kemp*, of Wichita, for appellant natural mother.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before GARDNER, P.J., BUSER, J., and BURGESS, S.J.

BUSER, J.:  Mother and Father appeal the termination of their parental rights to their son, A.R., born in 2015. They contend the State failed to present sufficient evidence that they were unfit to parent, and their unfitness was unlikely to change in the foreseeable future. Father also argues his due process rights were violated when he was allowed to proceed pro se without being given an opportunity to obtain substitute counsel or be provided with information regarding the dangers of self-representation.

We find that Father has not preserved his due process argument for appellate review. First, he has failed to comply with Kansas Supreme Court Rule 6.02(a)(5) (2020 Kan. S. Ct. R. 34). Second, while claiming constitutional error, Father has failed to assert

or brief prejudice as a result of that claimed error. Accordingly, the due process issue is procedurally barred and dismissed. Regarding Father's claim that there was insufficient evidence of his unfitness to parent A.R., we hold the district court did not err in terminating Father's parental rights.

Regarding Mother, we find the district court erred in terminating her parental rights to A.R. because there was insufficient clear and convincing evidence that Mother's unfitness was unlikely to change in the foreseeable future. Accordingly, the termination of Mother's parental rights is reversed, and the case is remanded for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

In September 2016, the Department of Children and Family Services (DCF) received a report alleging physical neglect of A.R. In particular, A.R. was malnourished and weighed only 18.63 pounds at his 20-month doctor's appointment. In fact, his height and weight were not reflected on the normal growth chart, indicating that he was failing to thrive. Mother and Father were reportedly feeding A.R. only watered-down milk, raw vegetables, cereal, and water. Shortly thereafter, A.R. was placed in protective custody, and the parents agreed to family preservation services.

Efforts to preserve the family were less than successful. In March 2017, A.R. was admitted to the hospital because of his low weight. A few days later, the State filed a child in need of care (CINC) petition. Among other concerns, the petition alleged the parents' roommate had a conviction for indecent liberties with a child, but the parents allowed him to provide a significant amount of care for A.R. Moreover, Father did not permit family preservation workers to interact with A.R. during visits, and the parents were not following feeding recommendations for A.R.

2

The district court placed A.R. in the temporary custody of DCF. Mother and Father appeared at an adjudication hearing in April 2017. They both entered no contest statements, and the court adjudicated A.R. as being a CINC. The district court ordered A.R. to remain in DCF custody and directed Mother and Father to complete case plan tasks designed to reintegrate A.R. with his parents.

In the meantime, Mother gave birth to a baby girl in May 2017. Mother and Father gave legal guardianship of the baby to their landlord's girlfriend to avoid the possibility of the baby being placed in State custody. The parents planned to end the guardianship once the CINC case was over.

At a review hearing in April 2018, Father expressed dissatisfaction with his appointed counsel and asked to represent himself. The court promptly granted his request.

In October 2018, the State moved to terminate the parental rights of Mother and Father. The district court held a hearing in January 2019. The following facts are taken from stipulations, testimony, and exhibits from the termination hearing.

Mother testified that A.R. was in state custody because she had not been properly feeding him. Mother acknowledged that she was unaware of A.R.'s increasing nutritional needs and that was her fault. Mother believed that she knew how to feed A.R. now because she had taken a parenting class and had sought help from others. Mother did not have any concerns about raising her children because she had enough resources to assist her.

When Mother and Father attended their visits with A.R., the visits typically went well. Nevertheless, Mother and Father were still having one-hour supervised visits at the time of trial. Of note, ordinarily, parents progress beyond one-hour supervised visits by this time, but Father had been unable to produce a urinalysis (UA) that was drug-free.

3

Father's UAs and hair follicle tests regularly tested positive for marijuana. Although Father testified that he quit using marijuana in 2004, he explained the routinely positive test results were caused by individuals using marijuana that he detains as a bounty hunter. Father also opined that because he was a heavy smoker for 13 years, "it's not going to be out of [his] system that quick." Although Mother tested positive for marijuana use on one occasion, caseworkers had no concerns about her using illegal drugs.

Lizabeth Rinehart, the family's case manager from August 2017 until November 2018, reported that Father frequently became frustrated during their interactions, and he was verbally abusive at times. Father admitted he had had problems with the caseworkers, but he said this was because the caseworkers lied to the parents about what they needed to do to increase their visitation. Father also admitted he had an anger problem, but that he had completed an anger management class. While Father said the class had been helpful, Rinehart testified that he needed more help in controlling his anger.

Caseworkers reported that Father was very controlling of Mother. He would often talk over her, take the phone away from her, or answer questions directed at her. Similarly, caseworkers had concerns about Mother's ability to make parenting decisions without Father. A clinical assessment reported Mother "appeared deeply dependent on [Father], to an unhealthy degree," and Father "seemed to have a high need for control and fosters dependency in his relationship with Mother." Father denied controlling Mother. Instead, Father said he helped her when she needed it. Mother also did not believe Father was controlling her.

Mother and Father had been together since 2004 but they were not married. At a hearing in August 2018, the district court told Mother "she had to choose between [A.R.] or Father," so they separated a couple months later. They had planned to live together

after the case had ended, although Mother testified that she would not reunite with Father until he produced clean UAs.

Caseworkers raised doubts that the parents had separated. Deanna Atkinson, the family's support worker since June 2018, testified she recently had a conversation with Father about Mother's visits. Atkinson told Father she did not want to discuss Mother's visits with him because Mother and Father had been having separate visits for the past couple months. Father told Atkinson that he needed to know about Mother's visits because he coordinates their rides.

Atkinson recalled another occasion when she conducted a surprise visit at Mother's home. When she knocked on the door, she heard Father yell, "Who is it?" Father then looked out the window, but no one answered the door. Mother texted Atkinson a few hours later to ask if Atkinson had knocked on her door. Mother said she did not answer because she was in the shower. Although Atkinson testified that she was not necessarily concerned Father was there, she was concerned that she was not allowed access to the home.

Father testified he still had contact with Mother after they separated. Their separate visits were scheduled consecutively, so he saw her at visits with A.R. He also admitted that he stopped by her apartment to check on her and see if she needed anything for the children. Mother testified she still asked Father to come over to talk about the children.

Father owned a bounty hunting business for 21 years. In 2018, he testified that he earned $1,000. In 2016, due to a change in licensing requirements for bounty hunters, Father was unable to obtain a license because he had an Illinois felony conviction for aggravated criminal sexual abuse. Father testified that he had planned to present proof of

5

employment at the trial, but he had accidentally left the document at home. Father never provided proof of employment.

Mother was not employed but she received disability benefits due to having cerebral palsy. She planned to support her children with those benefits. Mother had investigated finishing high school in order to obtain employment. She did not know how much it cost to raise a child, but she planned on obtaining that information from caseworkers.

Mother testified that she was taking medication for depression and anxiety. She started individual therapy in January 2018 but stopped after three visits. According to Mother, she became ineligible for medical benefits and insurance would not cover the expense. Recently, Mother started individual therapy again, but she missed several appointments due to buses being late. During this proceeding her father died, and Mother completed a grief counseling class. Her clinical assessment indicated that she may have cognitive deficits. The assessment also reported a diagnosis of dependent personality disorder, although Mother insisted that she could do things by herself.

Father testified that he has bipolar disorder. He had previously been on medication, but he stopped taking it more than 20 years ago because he did not think it was necessary. Father completed a medical evaluation in 2018 without any recommendations for medication.

Mother had lived at her current residence for six months, and she had lived at her previous residence for two to three years. Although Father had previously lived with Mother, he moved out when the two separated in October 2018. Father was living for free in a rental property until the landlord could find a paying tenant.

Caseworkers testified that Father had not completed several court orders and had not demonstrated any secondary change. While Mother had demonstrated primary change by completing all her court orders, she had not demonstrated secondary change. Caseworkers still had concerns about her relationship with Father and whether she could parent on her own. Mother appeared to have separated from Father in order to comply with the district court's order, not because she had any concerns regarding Father.

Rinehart and another caseworker recommended termination. Their primary concern with Father was his inability to produce a drug-free UA. Their primary concern with Mother was her relationship with Father. Rinehart acknowledged, however, that she had not worked with Mother since November 2018, so her situation may have changed.

Atkinson was unsure about her recommendations regarding termination. She testified that she could probably recommend termination of Father's rights because he still had positive UAs. As for Mother, Atkinson had concerns about whether she could parent alone, and she did not know if this would improve over time. She acknowledged, however, that Mother had made some progress since separating from Father.

After considering the evidence, the district court terminated the parental rights of Mother and Father. The court found both parents presently unfit and unlikely to become fit in the foreseeable future. The court also found it was in A.R.'s best interests to terminate the parental rights. Mother and Father appeal.

ISSUES RELATING TO FATHER'S DUE PROCESS RIGHTS

For the first time on appeal, Father contends his due process rights were violated when the district court allowed him to proceed pro se without appointing substitute counsel or informing him of the dangers of self-representation. The record does not show when Father was originally appointed counsel, but Judy Fowler entered her appearance as

appointed counsel at the adjudication hearing in April 2017. About a year later, during a review hearing, the following colloquy took place:

> "MS. FOWLER: I would advise the Court, I have given you a copy of a letter— a note that my client wrote to me this afternoon requesting a new attorney be—actually, that I no longer represent.
>
> "THE COURT: [Father].
>
> "[FATHER]: Yes, Your Honor.
>
> "THE COURT: What concerns do you have with Ms. Fowler?
>
> "[FATHER]: The concerns I have with Ms. Fowler, Your Honor, is [Mother's] attorney gives her privileged information that my attorney doesn't tell me, as our son acting out after phone calls, after visits. I'm not being told that information.
>
> "As of February 22nd, when we had court, [Mother's] attorney stood up and said that they were interested in getting the child returned to his mother. My attorney did not stand up and correct that. Therefore, Your Honor, I would like to represent myself in court instead of having Ms. Fowler do it.
>
> "THE COURT: If you want to represent yourself, that's your right.
>
> "Ms. Fowler, thank you for the service you have given to the court. I am going to excuse you from further representation on this case. [Father] can represent himself."

Father's note to Fowler was not included in the record on appeal. We observe that the district court did not inquire of Fowler about the contents of the note, whether she had attempted to mitigate Father's concerns regarding her representation, and whether, in her opinion, there was a breakdown in the attorney-client relationship. Moreover, the district court did not question Father regarding whether the instances he cited in his note represented a breakdown in the attorney-client relationship or whether a substitute counsel might be appropriate. Finally, the district court did not make inquiry of Father to determine if he knowingly waived his statutory right to counsel.

Father represented himself for the rest of the proceedings, including during the termination hearing in January 2019.

8

Father now argues the district court should have appointed substitute counsel. Alternatively, he argues the court should have informed him of the dangers of self-representation. In short, Father contends the district court denied him procedural due process.

The State objects to our consideration of Father's due process issue: "Father has failed to comply with Rule 6.02(a)(5). He does not acknowledge that the argument he now seeks to raise was never before the district court, let alone articulate an exception to the general rule on appealability."

It is undisputed that Father did not raise this issue before the district court. Generally, issues not raised before the district court may not be raised on appeal. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). There are several exceptions to this general rule, however, including: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the judgment of the trial court may be upheld on appeal despite its reliance on the wrong ground or having assigned a wrong reason for its decision. *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014).

While there are exceptions to the general rule, an appellant must explain why an issue should be considered for the first time on appeal. As provided in *State v. Williams*, 298 Kan. 1075, Syl. ¶ 4, 319 P.3d 528 (2014):

> "Supreme Court Rule 6.02(a)(5) (2013 Kan. Ct. R. Annot. 39-40) provides that a party briefing an issue on appeal must make a reference to the specific location in the record on appeal where the issue was raised and ruled upon. If the issue was not raised below, there must be an explanation why the issue is properly before the court. A party failing to explain why an issue being raised for the first time on appeal is properly before the court risks having that issue deemed waived or abandoned."

9

Of particular relevance to the issue before us, in *State v. Godfrey*, 301 Kan. 1041, 350 P.3d 1068 (2015), the defendant in a criminal case sought to raise a constitutional due process argument for the first time on appeal. Our Supreme Court, citing Rule 6.02(a)(5), held that it

> "requires an appellant raising a constitutional issue for the first time on appeal to affirmatively invoke and argue an exception to the general rule that such claims may not be raised for the first time on appeal. Failure to satisfy Rule 6.02(a)(5) in this respect amounts to an abandonment of the constitutional claim." 301 Kan. 1041, Syl.

Moreover, citing *Williams*, the Supreme Court reiterated, Supreme Court "Rule 6.02(a)(5) means what it says and is ignored at a litigant's peril." *Godfrey*, 301 Kan. at 1043. Godfrey's constitutional due process claim was not reviewed by our Supreme Court.

Father's failure to comply with Supreme Court Rule 6.02(a)(5) is especially noteworthy since, although the State objected to this failure in its appellee's brief, Father did not file a reply brief to answer the State's objection and inform us as to the relevant exception that would warrant our review of the due process issue for the first time. Father's omission in this regard is similar to the appellant's failure to file a reply brief in *Godfrey*. See 301 Kan at 1044.

Father's failure to comply with Supreme Court Rule 6.02(a)(5) is consequential. We conclude this failure constitutes an abandonment of the issue, a procedural bar, and, as a result, we decline to consider the due process issue.

There is a second reason why we are not considering this due process issue. As the State notes in its briefing, assuming that Father's due process rights were violated, Father has not asserted or briefed that prejudice resulted from this constitutional infirmity. On

the other hand, the State has persuaded us that if there was a due process violation, given the factual circumstances of this case it was harmless error.

When an error infringes on a party's federal constitutional rights, a court will declare a constitutional error harmless only when the party benefiting from the error persuades the court "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., proves there is no reasonable possibility that the error affected the verdict." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 [1967]).

Was Father prejudiced by his pro se representation? At the outset, we note that through most of this litigation Father was not pro se but was represented by Fowler who was able to provide advice to Father about the critical importance of complying with the case plan objectives and court orders in order to avoid parental termination.

As discussed later in this opinion, at the time of the termination hearing, Father's pro se representation did not affect the outcome of the termination hearing because the evidence on several termination factors was uncontested and overwhelming. For example, Father's UAs repeatedly showed that he was using marijuana and Father acknowledged that he had not provided proof of employment. He also acknowledged his bipolar disorder and anger problems. During the lengthy litigation, Father showed a persistent lack of effort to adjust his parental circumstances and conduct to meet the needs of A.R. Father also substantially failed to comply with the court-ordered case plan designed to integrate A.R. into the parental home.

While an attorney undoubtedly would have mounted a better defense, given the clear and convincing evidence that Father was unfit to parent, we are convinced beyond a

11

reasonable doubt that any claimed due process error Father complains of did not affect the outcome of the termination hearing in light of the entire record. See 292 Kan. at 569.

In summary—assuming without deciding that the district court violated Father's due process rights—given Father's failure to claim or brief prejudice, and the State's showing that the claimed error did not affect the outcome of the trial in light of the entire record, we conclude that any error was harmless. As a result, there is no need to address the merits of the due process issue for the first time on appeal.

STANDARDS OF REVIEW AND LAW RELATING TO TERMINATION OF PARENTAL RIGHTS

A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Given the inherent importance and unique character of that relationship, the right has been deemed fundamental. Accordingly, the State may extinguish the legal bonds between parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 2019 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

As provided in K.S.A. 2019 Supp. 38-2269(a), the State must prove the parent is unfit "by reason of conduct or condition" making him or her "unable to care properly for a child" and that the circumstances are "unlikely to change in the foreseeable future." The statute contains a nonexclusive list of nine conditions that singularly or in combination constitute unfitness. K.S.A. 2019 Supp. 38-2269(b). If a parent no longer has physical custody of a child, the statute lists four other factors to be considered K.S.A. 2019 Supp. 38-2269(c).

In reviewing a district court's determination of unfitness, an appellate court must be convinced, based on the full evidentiary record considered in a light favoring the State

12

as the prevailing party, that a rational fact-finder could have found that decision "highly probable, *i.e.*, [supported] by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. at 705. The appellate court may not weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705. In short, any conflicts in the evidence must be resolved in favor of the State.

In considering the foreseeable future, courts should use "child time" as the proper measure. As the revised Kansas Code for Care of Children, K.S.A. 2019 Supp. 38-2201 et seq., recognizes, children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult, and that different perception typically points toward a prompt, permanent disposition. K.S.A. 2019 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008); *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ("'child time'" differs from "'adult time'" in care proceedings "in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's").

Having found unfitness, the district court must then decide whether termination of parental rights is "in the best interests of the child." K.S.A. 2019 Supp. 38-2269(g)(1). As directed by the language of K.S.A. 2019 Supp. 38-2269(g)(1), the district court gives "primary consideration to the physical, mental and emotional health of the child." The district court makes that determination based on a preponderance of the evidence. See *In re R.S.*, 50 Kan. App. 2d at 1116. The assessment of the child's best interests is entrusted to the district court acting within its sound judicial discretion. 50 Kan. App. 2d at 1115-16.

An appellate court reviews the best interest decision for abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue.

See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *Ward*, 292 Kan. 541, Syl. ¶ 3.

TERMINATION OF FATHER'S PARENTAL RIGHTS

Father contends the district court's finding of unfitness was not supported by clear and convincing evidence. He asserts the State did not present any evidence that his mental health issues or drug use affected his parenting ability. While he does not deny the initial findings of physical neglect, Father claims the State did not present evidence of ongoing abuse or neglect at the time of trial. Finally, in response to his failure to complete case plan tasks, he claims the tasks were either unreasonable or reasonable efforts did not help him achieve those tasks.

At the conclusion of the termination hearing, the district court made a general finding that "[Father's] testimony is not credible to this Court." The district court found Father was unfit to parent A.R. under six separate subsections of K.S.A. 2019 Supp. 38-2269. We will separately address the district court's findings as they relate to individual subsections.

*K.S.A. 2019 Supp. 38-2269(b)(1)*

Under K.S.A. 2019 Supp. 38-2269(b)(1), a district court may terminate parental rights when clear and convincing evidence shows the presence of "[e]motional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child."

The district court found Father unfit under this factor because he was diagnosed with bipolar disorder and stopped taking medication in 1997. The court also found that

14

Father's demeanor in the courtroom showed why caseworkers had concerns regarding his anger management.

The evidence shows that Father had an emotional or mental illness, because he admitted to having bipolar disorder and anger problems. Father testified that he stopped taking medication for his bipolar disorder because he felt it was under control. Reports show that Father completed a clinical assessment in October 2018 recommending individual therapy and medication management. Rinehart testified at trial that "[i]t's very difficult for someone with bipolar to manage without medication." However, after Father completed a medication evaluation in December 2018, he was not recommended for any medications.

Regarding Father's anger, he acknowledged that he had an anger problem, but believed the situation was helped by completing an anger management class. Rinehart testified that she believed Father needed "more than that."

Although Father had a diagnosis of bipolar disorder and an anger management problem, we are not convinced there is clear and convincing evidence that these mental health conditions, alone, rendered Father unfit to care for A.R. See *In re J.L.*, No. 110,993, 2014 WL 4627604, *6 (Kan. App. 2014) (unpublished opinion) (reversing district court because evidence did not show parent's mental health issues rendered her unable to care for child).

*K.S.A. 2019 Supp. 38-2269(b)(3)*

Under K.S.A. 2019 Supp. 38-2269(b)(3), a district court may terminate parental rights when clear and convincing evidence shows "the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child."

15

Regarding this factor, the district court found most, if not all, of Father's UAs tested positive for marijuana, including a UA he submitted on the day of trial. The court also found Father had given "inconsistent and unbelievable reasons" for positive drug test results. The district court emphasized in August that it had admonished Father that he needed to produce clean UAs. The district judge added, "I cannot put a child back into a home until there is a commitment to sobriety. And even with termination on the line, you could not provide a clean UA."

On appeal, Father candidly concedes: "It is undisputed in this case that Father continued to test positive for marijuana." Instead, he briefly argues that no evidence showed a connection between his drug use and a failure to meet A.R.'s needs.

Our court has previously held a parent's drug use alone does not necessarily mean a child is a CINC or that a parent is unfit. See *In re L.C.W.*, 42 Kan. App. 2d 293, 301, 211 P.3d 829 (2009). But Father's case is distinguishable from *In re L.C.W.* where the parents' drug use was unproven. 42 Kan. App. 2d at 299-00. Here, in contrast, Father tested positive for marijuana or THC about 20 times throughout the proceedings and never produced a clean UA.

This evidence clearly shows Father's persistent use of marijuana, and an unwillingness or inability to modify his addictive behavior. It is understatement to observe that a parent habitually under the influence of illegal drugs is unable to provide the essential care for a young child's physical, mental, and emotional needs. Moreover, Father's use of illegal drugs was done with full knowledge that his failure to produce clean UAs would result in continued limitations on his visitations with A.R., in addition to risking termination of his parental rights. As the State points out, "Father's actions prevented the visits from becoming unsupervised, lasting for a longer period of time, or occurring in the home." Still, Father was either unable or unwilling to curtail his illegal

16

drug use which adversely affected A.R.'s need for parental love, care, and attention during these proceedings.

Additionally, Father exhibited an awareness that his illegal drug use was detrimental to good parenting by providing inconsistent and farfetched accounts to explain his positive UA results. Father told one care provider that he smoked marijuana for pain relief, and he had had only three positive UAs. He told another care provider he was exposed to marijuana through his job as a bounty hunter. The district court noted, "[Father] testified that he quit in 2004, 15 years ago, and he hasn't used [marijuana] but still continues to have dirty UAs from that. It's unbelievable." Father was fully aware that his habitual use of marijuana was considered by the district court to be detrimental to reintegration with A.R.

In sum, the record shows Father routinely and persistently used marijuana during the 22 months this litigation was pending, despite knowing that his illegal conduct would limit his ability to visit his son and provide A.R. with essential love and emotional support. Even with the prospect of having his parental rights terminated, Father lied about his illegal drug use, did not curtail his use, and thereby exhibited his inability to care for A.R.'s physical, mental and emotional needs in a drug-free environment.

Clear and convincing evidence proved Father's parental unfitness under this factor.

*K.S.A. 2019 Supp. 38-2269(b)(4)*

Under K.S.A. 2019 Supp. 38-2269(b)(4), a district court may terminate parental rights when clear and convincing evidence shows "physical, mental or emotional" abuse or neglect or sexual abuse of a child. K.S.A. 2019 Supp. 38-2202(t) defines neglect as "acts or omissions by a parent . . . resulting in harm to a child, or presenting a likelihood of harm, and the acts or omissions are not due solely to the lack of financial means of the

17

child's parents or other custodian." Especially relevant to this appeal, neglect may include "[f]ailure to provide food . . . necessary to sustain the life or health of the child." K.S.A. 2019 Supp. 38-2202(t)(1).

There was uncontroverted evidence that at the outset of this case, A.R. was neglected. The circumstances leading to the filing of the CINC petition were that A.R. was dangerously underweight because Mother and Father were not feeding him properly, and the parents left him in the care of a convicted child sex offender.

While Father does not contest that early on, A.R. had a failure to thrive due to Father's failure to provide sufficient nutrition to the child, Father contends this fact does not support a finding that he is presently unfit to parent A.R. Father points out that he completed parenting and nutrition classes. Additionally, he argues that the convicted sex offender was required to move out of the residence.

Father's neglect of A.R. at the beginning of this proceeding was sufficiently serious as to require A.R.'s hospitalization. The record also shows that Father had difficulty following basic feeding recommendations for A.R., especially when he diluted A.R.'s prescribed high-calorie formula with milk.

On the other hand, we agree with Father that the focus of our inquiry should be on whether "the parent *is* unfit" due to neglect of his son. (Emphasis added.) See K.S.A. 2019 Supp. 38-2269(a), (b)(4); *In re D.H.*, 57 Kan. App. 2d 421, 433-34, 453 P.3d 870 (2019). In this regard, subsequent to A.R.'s hospitalization, Father did take steps to successfully complete parenting and nutrition classes. Moreover, reports on Father's visitations with A.R. indicated that Father provided food to A.R. and encouraged him to eat.

18

On this record, we are not persuaded there was clear and convincing evidence that at the time of the adjudication hearing, Father was unfit due to his neglect of A.R.

*K.S.A. 2019 Supp. 38-2269(b)(7), K.S.A. 2019 Supp. 38-2269(b)(8), and K.S.A. 2019 Supp. 38-2269(c)(3)*

Finally, the district court found Father unfit under three separate but related subsections: K.S.A. 2019 Supp. 38-2269(b)(7), "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;" K.S.A. 2019 Supp. 38-2269(b)(8), "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child;" and K.S.A. 2019 Supp. 38-2269(c)(3), "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home."

The district court found that Father had not completed some of the court orders and case plan tasks in a timely manner. For example, Father did not complete drug treatment on time or participate in individual therapy. Father also failed to provide proof of employment, income, or documentation related to his employment. Although Father claimed employment as a bounty hunter for 21 years, he testified that he only earned $1,000 in income in 2018. At the hearing, Father testified that he had planned to present proof of employment in court, but he had accidentally left it at home.

There were other indications of Father's limited income given that he was living in a rental property free of charge until his landlord was able to find a paying tenant. Before the CINC petition was filed, caseworkers had to provide the family with groceries. During the proceedings, caseworkers gave bus passes to the family more than once. On one occasion, Father reported that he was donating plasma to obtain money to pay for an assessment.

19

In addition to not providing proof of employment, Father also failed to submit any clean UAs despite his achievement plan, which required that he produce three consecutive UAs before visitations with A.R. would increase. This is a substantial failure to comply with a reasonable plan aimed at reintegration. Despite these explicit instructions, Father submitted at least 17 positive UAs and four positive hair follicle tests between March 2017 and December 2018. He never produced a single clean UA. Despite the overwhelming evidence of continued drug use, Father simply denied using marijuana at all.

Lastly, the record is replete with examples of Father's anger problem and how it adversely impacted the implementation of the reintegration plan. Father was often uncooperative with and hostile towards caseworkers. For example, he was overheard saying he wanted to "knock the [expletive] out" of a caseworker. On one occasion, a caseworker commented that she had observed Father speaking to A.R. and Mother in a "rather harsh tone." The district judge also noted that he had observed Father's demeanor in the courtroom and, as a result, he could understand why caseworkers were concerned about his lack of anger control.

In summary, there was clear and convincing evidence to support the district court's legal conclusion that Father was unfit under K.S.A. 2019 Supp. 38-2269(b)(7); K.S.A. 2019 Supp. 38-2269(b)(8); and K.S.A. 2019 Supp. 38-2269(c)(3). Although public and private agencies made reasonable efforts to rehabilitate Father, these efforts were for naught. During almost two years of litigation, Father showed a lack of effort to adjust his parental circumstances and conduct to meet the needs of A.R. Lastly, Father substantially failed to implement the court-ordered case plan designed to integrate A.R. into the parental home.

As provided in K.S.A. 2019 Supp. 38-2269(a), the State must prove the parent to be unfit "by reason of conduct or condition" making him or her "unable to care properly

20

for a child" and that the circumstances are "unlikely to change in the foreseeable future." In reviewing the district court's determination of unfitness, we are convinced, based on four of the six factors found by the court, and the full evidentiary record considered in a light favoring the State, that a rational fact-finder could have found that decision "highly probable, *i.e.*, [supported] by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. at 705.

Moreover, clear and convincing evidence also shows that Father is unlikely to change in the foreseeable future. A.R. had been in state custody for 22 months, almost half of his life. During those 22 months, Father has repeatedly failed to modify his behavior in order to complete important case plan tasks or comply with court directives. Given this history, it is unlikely Father's condition would improve in the foreseeable future based on child's time.

Finally, on appeal, Father does not challenge the district court's finding that termination is in the best interests of A.R. Still, the child was almost four years old at the time of the termination hearing. He was reportedly doing well in his placement. A reasonable person could agree that A.R. needed permanency with caretakers who would provide for his health, welfare and safety.

Accordingly, we affirm the termination of Father's parental rights to A.R.

TERMINATION OF MOTHER'S PARENTAL RIGHTS

Finally, Mother argues the evidence is insufficient to support the district court's finding that she is presently unfit to parent and will remain so for the foreseeable future. Mother also asserts the district court abused its discretion in finding that it was in A.R.'s best interests to terminate her parental rights.

The district court found Mother was unfit to parent A.R. under K.S.A. 2019 Supp. 38-2269(b)(7), K.S.A. 2019 Supp. 38-2269(b)(8), and K.S.A. 2019 Supp. 38-2269(c)(3). While the district court found Mother unfit under three factors, it focused on one key fact to reach this conclusion—Mother had not ended her relationship with Father even though the court had ordered her to do so. The court found their separation was a "farce," and Mother had not exhibited secondary change because she did not personally feel the need to distance herself from Father.

At the termination hearing in January 2019, Mother testified that she did not believe that Father controls her or interferes in her expressing opinions or making decisions regarding A.R. Still, Mother testified that she complied with the district court's directive and separated from Father in November 2018. Although the parents do not reside together, Mother acknowledged that Father continues to support her with transportation and occasional meals. Mother testified that she still asked Father to come over to talk about the children. She indicated the separation would continue until Father maintains sobriety from illegal drug use.

Rinehart, who provided social work assistance until November 2018, testified that she did not advise Mother to separate from Father, but she attempted to explain to Mother about the district judge's directive of separation from Father. According to Rinehart, she had no concerns that Mother would be able to pay for utilities and food. Rinehart had no contact with Mother after December 2018.

Atkinson, a family support worker, assisted the family since June 2018. She was concerned about Father's influence on Mother and testified to her uncertainty regarding whether termination was appropriate. Atkinson also testified Mother had made progress since separating from Father. Additionally, she stated her willingness to continue working on the case since Mother and Father's separation was so recent. By continuing

22

the proceedings, she testified it would allow her to assess how Mother parents on her own.

Letitia Herrman, another social worker, testified that she was involved in the case since February 2018. She recommended termination, in part, because although the parents have separated, she was concerned if it is a real separation. According to Herrman, although Mother had made primary changes, she would need to see secondary changes—such as more consistency in attending therapy and maintaining her separation from Father. Herrman opined that it would take six months to determine if reintegration was still an option.

Turning to the statutory factors which the district court based its termination order on, we do not find evidentiary support for termination based on K.S.A. 2019 Supp. 38-2269(b)(7), "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family" or K.S.A. 2019 Supp. 38-2269(c)(3), "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home." On appeal, the State candidly concedes: "The district court acknowledged that [M]other had completed the case plan tasks." Our independent review of the record persuades us that the agencies tasked with the responsibility to reintegrate Mother with A.R. performed well and, as a result, Mother substantially complied with her case plan tasks.

It is clear that the district court's primary basis for termination was K.S.A. 2019 Supp. 38-2269(b)(8), "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child;" Applying this factor, the evidence was mixed regarding whether Mother's separation from Father was sincere and intended to be long lasting.

23

Our reading of the evidence persuades us that while Mother was reluctant to separate herself from Father, given the short period of time between the separation and the termination hearing, we are unable to say it is highly probable that Mother was unlikely to maintain this separation in the foreseeable future. See K.S.A. 2019 Supp. 38-2269(a). In particular, the testimony of Atkinson and Herrmann suggested that the short duration of the separation may not have been sufficient to evaluate the success of Mother's separation. Although Mother continues to have codependency issues, she had been attending individual therapy.

Since Mother substantially complied with her case plan requirements and separated from Father two months prior to the termination hearing, we conclude there was not clear and convincing evidence that in the foreseeable future Mother would not continue to adjust her circumstances, conduct, or conditions to meet the needs of A.R. by continuing the separation from Father. Accordingly, we conclude the district court erred in ordering the termination of Mother's parental rights to A.R.

Affirmed in part, reversed in part, and remanded.

\*\*\*

BURGESS, S.J., dissenting: I dissent. I agree with the majority's opinion except for the reversal of Mother's termination of parental rights. Mother's argument on appeal is that the district court lacked sufficient clear and convincing evidence of unfitness. Believing that there is sufficient clear and convincing evidence, I would affirm.

The mental health professionals involved with the case identified several issues regarding Mother. Predominant among them was Mother's low level of functioning, lack of insight, and a diagnosed dependent personality disorder. A person with such a diagnosis will sacrifice their own needs, wants, and necessities in order to maintain a

24

relationship with another regardless of whether that relationship is healthy or not. In many instances that person is not only willing to sacrifice their own interests but also the needs, wants, and necessities of their children in order to stay in the relationship.

In this case, it is clear Mother's relationship with Father was beyond toxic. Father was domineering over mother, was aggressive and threatening with caseworkers, used drugs knowing his drug use was a major concern in the case, and essentially took no steps to change his behavior over the duration of the case. The record is replete with examples of Mother's lack of acknowledgment of her situation or any definitive efforts to remove herself and A.R. from Father's influence.

During the course of the case, there are many examples of Mother's failure to resolve her dependency on Father. There was a period she did not go to therapy. Father attempted to control Mother's interaction with the caseworkers, and she allowed it. Caseworkers observed that Mother was unable to make decisions without Father's input and she would defer decisions to him. Father communicated with caseworkers regrading Mother's appointments with doctors, therapists, and others for Mother. Mother stated that she did not believe Father controlled her. She remained in the relationship throughout the case until they "separated" two months before the termination hearing. Mother separated not because she acknowledged how Father's conduct prohibited reintegration but only because her attorney urged her to. The caseworkers testified that they did not believe the parties had, in fact, separated. During this two-month period, Father continued to arrange Mother's transportation, was regularly at Mother's residence, and arrived with Mother at her visits. Their lives were still clearly intertwined. Mother specifically testified that she intended to get back with Father after the case was over.

Mother did try to complete orders. But there is clear and convincing evidence that issues mother was facing at the inception of this case remained throughout the case and at the time of termination. Making the statement that she intended to continue her

25

relationship with Father after the court was no longer involved clearly shows that Mother had not resolved her dependency issues or gained any insight on how unhealthy relationships impact her, let alone A.R. Even if Mother could separate from Father, which seems to be a longshot, without having thoroughly addressed her codependent personality disorder and without greater insight than she displayed over the course of this case, a risk continues that Mother and A.R. might find themselves in a situation no different than the one she has been in.

I believe that there was sufficient clear and convincing evidence to support the district court's finding of unfitness. I further believe that the district court's finding that the situation was unlikely to change and that it was in the best interest of the child to terminate parental rights was proper. This finding is based on the same evidence that the issues confronting Mother remained unresolved, in spite of the intervention offered to Mother over the duration of the case, and Mother's stated intention of continuing an unhealthy relationship with Father.