NOT DESIGNATED FOR PUBLICATION

No. 122,488

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of T.M.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; J. PATRICK WALTERS, judge. Opinion filed August 28, 2020. Affirmed.

*Jordan E. Kieffer*, of Dugan & Giroux Law, Inc., of Wichita, for appellant.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before BUSER, P.J., HILL and WARNER, JJ.

PER CURIAM: Father appeals the district court's judgment that he is unfit to parent his daughter, T.M. Father contends the district court erred when it found that he was presently unfit and would remain unfit for the foreseeable future to parent T.M. and that it was in the child's best interests to terminate Father's parental rights. Father also asserts the district court abused its discretion when it denied his request for a continuance. Alternatively, Father argues that his attorney's failure to compel the attendance of two out-of-state witnesses constituted ineffective assistance of counsel.

Upon our review of the parties' briefs and the record on appeal, we hold the district court did not err in its judgment or rulings. Accordingly, we affirm.

1

T.M. was born in August 2018, and two days later the Kansas Department for Children and Families (DCF) received an intake regarding concerns about the ability of Mother to care for T.M. A few days later, Paul Rehmet, a child protective specialist with DCF, met with Mother at her home. Mother told Rehmet about her mental health history and that her other three children were no longer in her care. One of the children lived with his father while the other two remained in the State's custody as children in need of care (CINC).

Mother also told Rehmet that Father was T.M.'s father and that Father and Mother were previously in a relationship that ended in February or March 2018. Mother advised that Father's cellphone was disconnected, and he no longer resided with her and T.M. Mother did not know of Father's whereabouts or have any contact information about him. Rehmet attempted to locate Father at a sober living facility, but he was informed that Father was terminated from the program in August 2018 due to a relapse. Rehmet also learned that Father had been terminated from his employment as a bus driver at First Student Inc. in early August 2018.

In late August, the State filed a Child in Need of Care Petition alleging that Father and Mother were unfit to parent T.M. As to Father, the petition alleged he was unfit due to lack of established paternity, the inability of the State to locate him, a lack of a stable living environment, his failure to intervene on T.M.'s behalf, a history of contacts with law enforcement, and failure to protect T.M. from Mother.

On September 5, 2018, the district court held a temporary custody hearing. At that time, the district court ordered that T.M. remain in DCF custody in an out-of-home placement. The order noted that Father's whereabouts were still unknown and he was in default. By October 26, 2018, Father had been located and the district court ordered a

continuance to allow him to obtain paternity testing. That same day, the State filed an "Amended Child in Need of Care Petition and Motion for Finding of Unfitness and Termination of Parental Rights."

The State's amended motion asserted that Father's paternity was still not established, listed Father's prior contacts with law enforcement (which included a pending charge of criminal trespass and no liability insurance), and that Father was in the Leavenworth Kansas Veteran's Administration domiciliary program where he was scheduled to remain until February 2019. The domiciliary is an inpatient treatment program that serves military veterans dealing with unemployment, addiction, homelessness, and mental health issues. Father was in the program to address his alcohol addiction.

On November 13, 2018, the district court ordered a continuance of the hearing on the State's amended termination motion until February 20, 2019. Of note, Mother voluntarily relinquished her parental rights on February 20, 2019. The termination of Mother's parental rights is not on appeal.

Father took a paternity test on December 5, 2018, and was notified in February 2019 that he was the father of T.M. Although Father knew T.M. was born before going to the domiciliary, he waited until the paternity results were received in February 2019 to become involved in the case because he believed there was another potential father. The district court ordered additional continuances on February 20, April 2, and June 4.

The termination of parental rights hearing occurred on July 30, 2019. Five witnesses testified for the State: Barbara Wilson, Cara Hall, Velvet Gonzalez, Lavana Faine, and Amanda Hart. Father testified on his own behalf in his case-in-chief. Father intended to call two therapists from Missouri, Melinda Thomas and Erica Fisher, but the Kansas subpoenas provided to them were not valid under the interstate compact on

subpoenas. Father sought a continuance to compel the witnesses' appearances, but the district court denied the request because it found the subpoena issue was foreseeable.

At the conclusion of the evidence, the district court found Father unfit to parent T.M. and terminated his parental rights. The district court also found that Father's parental unfitness would continue for the foreseeable future and that it was in T.M.'s best interests to terminate Father's parental rights.

Father timely appeals.

## TERMINATION OF PARENTAL RIGHTS

On appeal, Father contends the district court's finding that he was unfit and his unfitness was unlikely to change in the foreseeable future was not supported by clear and convincing evidence. Moreover, Father asserts that the district court abused its discretion by concluding that termination of parental rights was in the child's best interests. In response, the State highlights the evidence presented at the termination hearing in support of the district court's termination order.

Before terminating parental rights, the district court must find that the State proved by clear and convincing evidence that the parent is unfit and the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future. K.S.A. 2019 Supp. 38-2269(a). The district court must also find by a preponderance of evidence that termination of parental rights is in the best interests of the child. K.S.A. 2019 Supp. 38-2269(g)(1).

Our appellate standard of review dictates that in considering a district court's decision finding a parent unfit and unlikely to change, we must consider whether, after review of all the evidence viewed in the light most favorable to the State, our court is

4

convinced that a rational fact-finder could have found it highly probable, i.e., by clear and convincing evidence, that the parent is unfit and the conduct rendering the parent unfit is unlikely to change in the foreseeable future. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). Clear and convincing evidence is an "intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt." 286 Kan. at 691.

Of note, in our appellate review, we do not reweigh the evidence, judge the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705. Finally, we review the district court's decision regarding the best interests of the child for an abuse of discretion. *In re M.H.*, 50 Kan. App. 2d 1162, 1175, 337 P.3d 711 (2014).

The revised Kansas Code for Care of Children authorizes a district court to terminate parental rights based on certain statutory findings made after a child has been adjudicated a CINC. K.S.A. 2019 Supp. 38-2269(a). Ordinarily, the district court evaluates whether a parent is unfit by considering a nonexclusive list of factors provided in K.S.A. 2019 Supp. 38-2269(b) and (c). Any one of the factors standing alone may provide sufficient grounds for termination. K.S.A. 2019 Supp. 38-2269(f).

In this case, the district court relied on the following three statutory factors to find that Father was an unfit parent:

- reasonable efforts by appropriate public or private child caring agencies have been unable to rehabilitate the family, K.S.A. 2019 Supp. 38-2269(b)(7);
- lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child, K.S.A. 2019 Supp. 38-2269(b)(8); and

5

- failure to carry out a reasonable plan approved by the court directed toward the integration of the child into the parental home, K.S.A. 2019 Supp. 38-2269(c)(3).

Each factor is separately analyzed below.

*Failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family, K.S.A. 2019 Supp. 38-2269(b)(7)*

Father challenges the reasonableness of the efforts made by the various service providers in their attempt to rehabilitate the family. He contends the agencies did not expend reasonable efforts and the length of time he was given to comply with the court orders was too short. Father also believes that the social workers disregarded the progress he made because they did not care for his personality. The State responds that considerable efforts were made to no avail by service providers over the course of the proceedings.

K.S.A. 2019 Supp. 38-2269(b)(7) provides that when determining the fitness of a parent, one of the factors the court may consider is the "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." The statute focuses on reasonable efforts expended by service providers to achieve the goal of rehabilitation. As our court has observed, this factor does not "require proof that the appropriate agencies made a herculean effort to lead the parent through the responsibilities of the reintegration plan." *In re B.T.*, No. 112,137, 2015 WL 1125289, at *8 (Kan. App. 2015) (unpublished opinion). It also does not require the public or private agencies to provide every possible resource to the family; only that the agencies made a reasonable effort. *In re A.J.S.*, No. 95,283, 2006 WL 2043504, at *3 (Kan. App. 2006) (unpublished opinion). Finally, the requirement exists to provide a parent with an opportunity to succeed, but to do so requires the parent to exert some effort. *In re M.S.*, 56 Kan. App. 2d 1247, 1257,

447 P.3d 994 (2019); see *In re A.P.*, 121,913, 2020 WL 3022868, at \*10 (Kan. App. 2020) (unpublished opinion), *petition for rev. filed* June 30, 2020 and July 6, 2020.

The record shows that several professionals affiliated with various agencies attempted to assist Father in assuming his parental responsibilities. Since Father lived in Kansas City, Missouri, an ICPC Regulation 7 Expedited Placement was ordered on April 2, 2019. Barbara Wilson with the State of Missouri, Children's Division, ICPC unit was assigned to evaluate Father's case and determine whether Father had an appropriate home in Kansas City for placement of T.M. Given the expedited nature of this placement, Wilson provided paperwork for Father to complete within eight days. Father did not meet the deadline. Father told Wilson he thought he sent the paperwork electronically, although she never received it and Father did not resend it. The paperwork was never received prior to Wilson's completion of a home study report.

Wilson assisted Father in completing tasks necessary for T.M. to live with Father in his apartment. For example, Father did not have a crib for T.M., although he was on a waiting list for a donated one. Wilson investigated the matter and told Father about a crib for just under $100 that could be delivered the next day. According to Wilson, Father became agitated and said, "'That would be really hard for somebody to do that doesn't have a car. I told you my car was stolen when I moved to Kansas City.'" Wilson repeated several times that the crib could be delivered to his apartment. At the time of the termination trial Father still did not have a crib.

Wilson was particularly worried about the condition of Father's apartment. According to Wilson, the residence was not appropriate for a child stating, "It's not set up for a child. No supplies, no bed, all the safety measures not in place."

Wilson also worked with Father to obtain his fingerprints for the background check. On one occasion, Father called Wilson, while upset, advising her that "he wasn't

going to run around all over town getting fingerprints." After researching the issue on the internet, Wilson found a business, Test Smartly Labs, that collects fingerprints that was located 3 miles from his home and provided Father with the necessary information. Later, Wilson received a call from Father at the laboratory in an extremely agitated state and "completely out of control" because he had arrived too late for the laboratory to complete the necessary paperwork and take his fingerprints. Wilson could hear Father degrading the staff. She later called the laboratory to make sure that everyone was safe.

Velvet Gonzalez, an employee of Test Smartly Labs testified to the verbal dispute. According to her, after she called her boss and he was talking to Father on the phone, Father "got mad and threw the phone at us, which thank God there was a mirror which stopped it." Gonzalez testified that she was concerned for her safety.

Wilson did not approve placement of T.M. in Father's home. She testified to her reasons for the decision that included Father's "[d]ishonesty, unstable behavior, mental health, . . . the dishonesty is very concerning, as well [as] pending criminal—you know, what if he gets arrested and he has got a baby in his care? There [are] pending charges. There's just—it was just a lot of inaccuracies and inconsistent reports."

On appeal, Father emphasizes that he was given a limited amount of time to complete the necessary paperwork. At trial, Wilson agreed there was a short turnaround from the time that Father received the paperwork on April 25 to the May 3 deadline. She also agreed that there was a "significant amount of information" that Father needed to collect but she disagreed that not having a car would make it more time consuming to complete. According to Wilson, "The information that I was asking for is all things that he said that he had, and he should be able to fill out paperwork without going anywhere." Still, the paperwork was never received prior to Wilson's completion of a home study report in which she denied placement of T.M. in Father's residence.

8

The record shows that Wilson expended reasonable efforts to assist Father with the assigned tasks despite the expedited deadline. She performed a home walk-through, told Father what supplies he needed to obtain before she could approve placement, spoke with Father on the phone multiple times to explain what he needed to do, helped Father find a fingerprinting facility and a crib that he could buy, and attempted to verify Father's employment herself after Father failed to give her pay stubs from his claimed employers.

Lavana Faine, a licensed reintegration social worker at Saint Francis Ministries (SFCS) also expended reasonable efforts to integrate T.M. with Father. Faine first contacted Father in November 2018 while he was in the domiciliary program, but she did not begin working with him until after his paternity was established in February 2019.

Faine coordinated visits between T.M. and Father at SFCS, attempted to verify Father's employment, and communicated with Father in person and through phone calls, text messages, and emails. Faine reviewed and explained the district court's orders and case plan with Father multiple times to help him understand the integration process. According to Faine:

> "[O]nce we did start communicating, it was very hard because it seemed like every time we would talk, he would get upset because he said he didn't understand the process. And so then I would go over his court orders with him again, try to provide places on where he could get assistance. But then he would just always go back to, even after I explained all of that to him, still that he didn't understand what it was we needed him to do."

From the beginning of her involvement with Father, Faine asked him to submit to a psychological evaluation. At the time of the termination hearing, Faine understood that Father had recently obtained a psychological evaluation. Although Father had told her previously that he had signed a release, Faine learned later that it was signed only four days before the termination trial. As a result, Faine had not received a copy of the

9

psychological evaluation at the time of the trial. It should be noted that the psychological evaluation, admitted as Father's Exhibit F at trial, was not included in the record on appeal. Faine testified that based on her interactions with Father she did not believe he could physically, mentally, and emotionally meet T.M.'s needs. In particular, she was concerned about Father's mood swings.

Father's ability to progress towards integration with T.M. was hindered because he was frequently not truthful with the caseworkers. Faine testified that Father frequently lied about matters involving Wilson. For example, Father told Faine that Wilson was allowing him to submit his paperwork late and that the ICPC was going to be approved but Wilson confirmed that was not the truth. Faine testified that Father would frequently indicate that some task was completed when it was not. Ultimately, Faine and Wilson communicated with each other to learn accurate information about what tasks Father had completed.

Regarding employment, Father told Faine that he had been employed in several occupations for short periods of time during 2019. Faine attempted, without much success, to verify this employment history. She testified that she had concerns about Father's stability because "he has not proven to be able to maintain employment."

At the conclusion of her trial testimony, Faine recommended that Father's parental rights should be terminated. In particular, she highlighted that Father had not been honest and forthcoming with the information he provided, his home was not appropriate for T.M. to live in, there was lack of verification that Father addressed his mental health issues, and he failed to obtain a substance abuse evaluation.

Amanda Hart, a family support and reintegration worker with SFCS supervised the numerous visits between Father and T.M. According to Hart, Father and T.M. had a very good relationship during the visitations. Father would typically inquire into the child's

10

development and bring her a toy. But Hart testified that Father had mood swings, and a volatile personality towards Hart on one occasion. Hart, who was present for the testimony of Wilson and Faine, agreed that the mental health concerns observed by the other two witnesses were like her experiences with Father during the visitations.

Upon our consideration of K.S.A. 2019 Supp. 38-2269(b)(7), and a review of all the evidence in the light most favorable to the State, we are convinced that a rational fact-finder could have found by clear and convincing evidence that Father was unfit due to the inability of appropriate public and private child care agencies to rehabilitate Father. Father had access to community resources and enough time to make the necessary improvements to integrate with T.M. Moreover, the efforts of the agencies were reasonable, but Father failed to comply with the necessary tasks to achieve integration with T.M.

*Lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child, K.S.A. 2019 Supp. 38-2269(b)(8)*

Father contends the district court erred in finding that he lacked effort to adjust his circumstances, conduct, or conditions to meet the needs of T.M. Father asserts he made progress given the short period of time afforded him before the termination hearing. On the other hand, the State emphasizes that although Father was provided with reasonable resources and support, he was unable to adjust his circumstances, conduct, or conditions to meet T.M.'s needs.

K.S.A. 2019 Supp. 38-2269(b)(8) provides that when determining the fitness of a parent, one of the factors the court may consider is the lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child. The district court's finding under this subsection of the statute is supported by the evidence discussed in the previous section and other evidence. The record

demonstrates that Father's unstable housing, sporadic employment, and mental health concerns played important roles in finding that he was unfit under this factor.

Evidence presented at the termination trial showed that Father had a history of unstable housing. In early 2018, Father lived in a sober living community in Wichita called Liberty Way before being evicted. He then lived in Wichita for short stints with friends, family, hotels, and was briefly homeless. In August or September 2018, Father moved in with his aunt Carol. By October, Father had relocated to Kansas City and lived in the domiciliary to address his alcoholism. He remained there until January 2019. After the domiciliary, Father moved to Footprints, a transitional housing facility for homeless veterans, for about three weeks before being discharged in February 2019. Father then lived in a bed and breakfast for a brief period before relocating to an apartment in March 2019, where he continued to reside until the time of the termination trial.

As mentioned earlier, based on Wilson's walkthrough inspection of Father's apartment, she did not believe the housing was appropriate for a child. Moreover, Wilson testified she was "concerned with the safety of the apartment building and the neighborhood as well." Father candidly conceded that the neighborhood is "sketchy" and "[i]t's not somewhere you want to go at night."

Father's employment history was also sporadic. Father said he had intermittent employment dating back to early 2018, but he failed to verify this employment. As a result, a timeline of his employment is vague and uncertain. In early 2018, Father worked as a school bus driver at First Student Bus Company for a semester before being fired in early August 2018. After that, due to his alcoholism, Father entered the domiciliary. Father candidly acknowledged that prior to entering the domiciliary, "I was too deep into my alcoholism" to be regularly employed.

12

While at the domiciliary, Father said he was employed at FedEx until a Veterans Administration doctor revoked his working status due to a workplace injury in November 2018. Father did not have another job until after he left Footprints in February 2019. At that time, Father worked as a salesman at Seal Smart for about a month and a half before hiring on as a lead generator at Alenco Remodeling in late February or early March 2019.

Father testified that he worked for Alenco for three months before hiring on with Anytime IP, where he worked for three weeks. Father then returned to Alenco in June 2019. Father's second stint at Alenco lasted about two and a half weeks whereupon he quit after Alenco refused to pay him his last paycheck. The week before the termination trial, Father testified that he had started working at Budget Rent A Car.

As previously mentioned, Father's work history was rarely verified. Father never provided Faine with any proof that he worked at Anytime IP or Budget Rent A Car. Occasionally, Wilson and Faine learned that, for whatever reason, Father's account of employment was not accurate. For example, Wilson called Alenco to verify that Father was employed there, and she was told that Father had been terminated.

Father's ability to financially provide for T.M. was also called into question because he was not current in his child support for two other children. In summary, Faine's opinion that Father had not shown he was able to maintain stable employment was well supported by the available evidence.

Father's mental and emotional health was an important issue during the termination trial. Cara Hall, a licensed clinical social worker at the Kansas City Veterans Administration, worked with Father at Footprints. Hall conducted a complete biopsychosocial assessment of Father in January 2019 and diagnosed him with a narcissistic personality disorder and exhibiting possible bipolar disorder. As a result, Hall encouraged Father to see a psychiatrist. But Father did not agree with her suggestion,

13

because he did not want it to interfere with his job search. Father was unwilling to address his mental health needs while at Footprints. According to Hall, Father

> "seemed unaware of his behaviors and how it affected other people and how ultimately it would affect him. And that was a concern. He didn't seem to have insight into the fact that . . . his angry behaviors and his—just his general tone of disrespect to other people, how that would come back and hurt himself."

Wilson and Faine had similar difficulties in trying to get Father to complete mental health evaluations. Father told Wilson in May 2019 that he was aware that he needed a psychological evaluation, but he had not completed it. Faine testified that she told Father from the beginning of the case that he needed to obtain a psychological evaluation.

As recounted earlier, Father's angry outbursts towards Gonzalez at the Test Smartly Labs and at Hart while she was supervising a visit with Father and T.M. raised concerns about his parenting skills. Additionally, Father's difficulties managing his anger and understanding instructions when communicating with Wilson and Faine, clearly showed a pattern of behavior that is not conducive to parenting a young child. Still, Father did not take timely action to address his mental and emotional health.

At trial, Father testified that he voluntarily began individual and group therapy at Truman Medical Center in the month prior to trial. However, Faine testified that Father never told her about joining a therapy group. A recent psychology therapy note from Truman Medical Center indicated that Father was given a diagnosis of "adjustment disorder." Father admitted, "I'm looking at raising a child on my own. That's a big adjustment." Given Father's multiple diagnoses of narcissistic personality disorder, possible bipolar disorder, adjustment disorder, and his anger control issues, we are

14

persuaded that he did not obtain the necessary evaluations, care, and treatment to achieve the necessary mental health to parent T.M.

While Father had five months to adjust his circumstances, conduct, or conditions to meet T.M.'s needs, the evidence sufficiently showed that in matters of housing, employment, and mental and emotional health, Father failed to exert sufficient effort. On the contrary, Father's deficiencies were serious and persistent.

*Failure to carry out a reasonable plan approved by the district court directed toward the integration of the child into the parental home, K.S.A. 2019 Supp. 38-2269(c)(3)*

The district court found a third factor, K.S.A. 2019 Supp. 38-2269(c)(3), was also applicable in establishing Father's parental unfitness. In the language of the statute, a district court may terminate a parent's rights to his or her child if "a child is not in the physical custody of a parent" and, there is clear and convincing evidence of the "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home." K.S.A. 2019 Supp. 38-2269(c)(3).

As to this statutory factor, Father contends:

"although Father did not quite complete all of his case plan tasks, he did either complete or make significant progress towards the most important tasks in the case—including obtaining stable housing, employment, attending a parenting class, obtaining a psychological evaluation, addressing his substance abuse issues, maintaining regular and appropriate visitation with [T.M.], and seeking mental health treatment—all in the very short time frame actually allowed him."

Father's assertions are not supported by the record. As documented earlier, at the time of the termination trial, Father did not have stable housing or employment. Although he obtained a psychological evaluation, the report of which was admitted as Father's

Exhibit F, the case managers had little or no knowledge about it since Father only obtained it a few days before the termination trial. Father's claim to have participated in mental health therapy shortly before the termination trial was not confirmed by corroborating evidence. Father also failed to timely sign medical releases and complete paperwork that hindered his ability to successfully achieve the goals of the integration plan.

Father did not obtain a substance abuse evaluation as directed. In his favor, however, Father had numerous scheduled urine tests that were negative for alcohol. Under the plan, he was permitted to schedule these tests in advance of trips to Wichita. No random tests were required under the plan. Moreover, Father did successfully comply with the visitation program, visiting T.M. on 13 occasions. Additionally, he completed a five-hour parenting course.

As the record shows, Father completed a few of the case plan tasks but as to the critical goals of stable housing, employment, and mental health, Father's efforts were insufficient and unsuccessful. As Faine stated in her report, Father "has not fully engaged in the reintegration process." We are persuaded that the State presented clear and convincing evidence that Father failed to carry out a reasonable plan directed towards integrating with T.M.

*Father's conduct or condition is unlikely to change in the foreseeable future*

Having found clear and convincing evidence to support the district court's finding of parental unfitness under K.S.A. 2019 Supp. 38-2269(b)(7), (b)(8), and (c)(3) we next consider whether there was clear and convincing evidence to support the district court's finding that the conduct or conditions which rendered Father unfit are unlikely to change in the foreseeable future. See K.S.A. 2019 Supp. 38-2269(a).

Father complains that although the case had been pending for 11 months at the time of the termination trial, given the delay in Father's paternity test results, he had only 5 months to address the district court's parenting concerns. Father argues that he was given insufficient time to accomplish the case plan goals and, given his progress in achieving some of those goals, there was no basis to conclude that he would be unable to change his conduct or condition in the foreseeable future.

The State counters that the "court heard testimony and was presented with exhibits showing that the issues that were present in [F]ather's life at the beginning of the case were still present at the time of termination." The State also emphasizes that the foreseeable future should be measured in child time.

T.M. was in DCF custody for 11 of the first 12 months of her life. She has never resided with Father. Kansas law recognizes that children experience the passage of time differently than adults. See K.S.A. 2019 Supp. 38-2201(b)(4). As our court has stated: "In determining whether a parent's conduct or condition is likely to change in the foreseeable future, the foreseeable future is to be considered from the child's perspective, not the parents', as time perception of a child differs from that of an adult." *In re S.D.*, 41 Kan. App. 2d 780, Syl. ¶ 9, 204 P.3d 1182 (2009). See *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ("'child time'" differs from "'adult time'" in care proceedings 'in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's')."

As a result, the test is not whether Father was taking reasonable steps towards carrying out the case plan, meeting the needs of T.M., and integrating the family, but whether Father has the ability to actually accomplish—in the foreseeable future based upon child time—the necessary goal of unification.

In considering the question of the foreseeable future, a court may predict a parent's future unfitness based on his or her history. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). Father's history was the focal point of the district judge's findings:

> "[E]very person that you come into contact with that has anything to do with this case ends in conflict. . . . [I]t is extremely rare that we have the type of conflict with parents in child welfare cases that has occurred in this case with you.
>
> "Here are the observations and the facts of the Court. You are 50 years old, sir, and you know that you have mental health problems. From the testimony, the finding of the Court is that you have never adequately and appropriately addressed those mental health concerns.
>
> "During your testimony, most of your testimony was either nonresponsive or narrative, trying to place yourself in some grandiose position and everybody is trying to tear you down. But you have made this case equally hard on yourself as well as everybody else concerned. You didn't timely sign your releases so we could obtain the information and get to the bottom of the mental health issue and what you have done, if anything, to adequately address those mental health needs. Because the fact is and the Court finds that you have some pretty severe narcissistic tendencies based on the testimony of the witnesses and the observation of your testimony here in court today. It's everybody else's fault. It's not your fault. And that's—the Court finds that's simply not true. The fault lies with you, sir, because you haven't addressed your issues appropriately.
>
> "And to that extent and based upon your numerous short-term employment situations, the Court has serious concerns about Father's ability to maintain employment based on his conflict with people—all people he seems to come into contact with.
>
> . . . .
>
> "I have taken into consideration child time. This case has been on file since August of last year. I find that you became aware of this, and I will accept everybody's testimony, in November of last year. You have had ample time to comply, to complete—successfully complete the orders of the Court. You have not done that."

The district court's observations of Father's narcissism and confrontational approach to problem solving were echoed by T.M.'s guardian ad litem. When asked by the district court for his recommendation regarding termination, the guardian ad litem

replied, "Yes, I definitely recommend termination. I think that [Father] has . . . sought help, pulled the plug on the help in various facilities, and he isn't going to listen to anybody because he knows more than everybody else."

After reviewing all of the evidence in the light most favorable to the State, we are convinced that a rational fact-finder could have found it highly probable that Father's conduct or condition rendering him unfit to parent T.M. was unlikely to change in the foreseeable future. See K.S.A. 2019 Supp. 38-2269(a); *In re B.D.-Y.*, 286 Kan. at 705.

Father's unstable housing, sporadic employment, and mental or emotional problems preceded the filing of this case and persisted throughout the proceedings with modest or no improvement. As of November 2018, Father knew that he was potentially the father of T.M. This provided him with about eight months in which to prepare for taking over the responsibilities of parenthood. When Father's paternity was confirmed three months later, that left Father with five months to address the previously identified problem areas. We acknowledge that five months is a shorter time period to achieve case plan goals than in most termination cases. Still, given the long-established and serious inadequacies that remained in Father's parental fitness at the time of the termination trial, we are convinced that additional time would not have improved the probability of Father integrating with T.M.

Looking at the evidence in the light most favorable to the State, and based on Father's history, there was clear and convincing evidence that Father was unlikely to change his conduct or condition of unfitness in the foreseeable future.

*The best interests of T.M.*

On appeal, Father claims there was not substantial competent evidence that parental termination was in T.M.'s best interests. Father points out that he and T.M. had

an immediate bond, supervised visitations went well, and "Father interacted appropriately with [T.M.]"

Our court reviews a district court's decision regarding the best interests of the child for an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014). An abuse of discretion occurs when no reasonable person would agree with the district court or if the court bases its decision on an error of fact or law. 50 Kan. App. 2d 1105, Syl. ¶ 2. A district court also exceeds its broad latitude if its ruling is "arbitrary, fanciful, or unreasonable." *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013).

The district court found by a preponderance of evidence that termination of parental rights was in the best interests of T.M. See K.S.A. 2019 Supp. 38-2269(g)(1). In making this determination, the court gives primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2019 Supp. 38-2269(g)(1).

> "[T]he court must weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives. In making such a determination, we believe the court must consider the nature and strength of the relationships between children and parent and the trauma that may be caused to the children by termination, weighing these considerations against a further delay in permanency for the children." *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010).

Here, T.M. has been in DCF custody since she was one month old. During this entire time, she has resided with the same foster family and is doing well in that placement. The only contacts Father had with T.M. were 13 brief supervised visits over the course of these proceedings. While these visits have gone well, given the child's tender years and the occasional and brief character of the visits, the nature and strength of the parent/child relationship is not firmly established. On the other hand, given the

20

district court's finding that Father's unfitness to parent would not change in the foreseeable future, and given the tender age of this child the need for permanency becomes increasingly apparent.

Because the record shows that T.M.'s health and well-being would be at risk if parental rights were not terminated, a reasonable person could agree with the district court's decision that termination was in the best interests of the child. The district court did not abuse its discretion in ruling that termination of parental rights was in the best interests of T.M.

## MOTION FOR CONTINUANCE

Father contends the district court's decision to deny his request for a continuance to allow two therapists to testify at the termination trial was unreasonable. The State counters that Father did not adequately proffer the substance of the therapists' testimony and, on appeal, failed to properly designate the record.

In termination of parental rights cases, this court reviews a district court's denial of a motion for continuance for abuse of discretion. *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008); *In re J.M.B.*, No. 112,578, 2015 WL 4460578, at *5 (Kan. App. 2015) (unpublished opinion). "[A] judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact." *Northern Natural Gas Co.*, 296 Kan. at 935; *J.M.B.*, 2015 WL 4460578, at *5.

Of particular significance in this case, Kansas statutes provide that proceedings in CINC cases "shall be disposed of without unnecessary delay. Continuances shall not be granted unless good cause is shown." K.S.A. 2019 Supp. 38-2246. Moreover, a district

21

court grants a continuance only if it finds it is in the best interests of the child. K.S.A. 2019 Supp. 38-2267(a).

When it rules on a motion for continuance, the district court must consider "'all circumstances, particularly such matters as the applicant's good faith, his showing of diligence, and the timetable of the lawsuit.' [Citation omitted.]" *In re J.A.H.*, 285 Kan. 375, 385, 172 P.3d 1 (2007).

At the conclusion of Father's testimony in the defense case, Father's counsel informed the district court that she intended to call Thomas and Fisher, two therapists from Kansas City, Missouri, as witnesses but she had just learned they were unavailable. Father's counsel advised the district court that an attorney for the two therapists had called during the trial and advised that Thomas and Fisher would not appear in person or by telephone because the Kansas subpoenas they received were not valid in Missouri. Father's counsel did not argue that it was in T.M.'s best interests to continue the hearing. See K.S.A. 2019 Supp. 38-2267(a).

Father's counsel acknowledged that the district court previously had advised the parties it would not permit additional continuances, but she moved for a continuance to compel the testimony of the two therapists. According to Father's attorney, Fisher had told her "she had no concerns about the child going home."

This was not the first continuance that Father had sought in this case. The State filed the "Amended Child in Need of Care Petition and Motion for Finding of Unfitness and Termination of Parental Rights" in October 2018, and the original date for a hearing on the motion was November 13, 2018. But the district court ordered a continuance to allow for paternity testing, and Father received those results in February 2019. Once paternity was established, the district court ordered continuances on February 20, April 2, and June 4, to allow Father an opportunity to demonstrate that he was fit to parent T.M.

22

Moreover, during Father's cross-examination it was established that he chose to be evaluated in Kansas City, although at a prior hearing the district court had advised the parties that such an out-of-state evaluation would create "difficulty in dealing with witnesses from another state."

The district judge denied the motion for continuance:

"And this is one of the questions that's been bothering me during this proceeding and during this case, is that this was not unanticipated that we were going to have problems with witnesses in Missouri. Number one, it's across state lines. Number two, our subpoena powers by statute don't go that far. So I knew that was going to be a problem, and I addressed that with [State's counsel] on her witnesses. And there is nothing I can do. All right?
        "I told you that at the beginning of the trial that that was an anticipated problem."

The district court's ruling reflects that it did not believe Father had demonstrated good cause to grant a continuance. See K.S.A. 2019 Supp. 38-2246.

Father has failed to present us with a record showing error. Although Father's mental and emotional health was an important aspect of the trial, Father has not included Father's Exhibit F, which was described as a mental health evaluation which discussed diagnoses by Dr. Vanipenta, in the record on appeal. Testimony by Father also referenced therapy notes admitted in evidence but did not identify the mental health professional(s) who created them. These notes are also not in the record.

We are left to speculate about whether Father's exhibits contained findings and opinions from Thomas and Fisher regarding Father's mental status. If so, the necessity for their trial testimony would be lessened. Moreover, the possible prejudice of not having the testimony of the therapists at trial is unknown because there is no evidence or substantive proffer about what, if any, professional findings and opinions the therapists

23

were prepared to testify about. The burden is on the party making a claim of error to designate a record sufficient to present its points to the appellate court and to establish its claims. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644, 294 P.3d 287 (2013). Brown has failed to establish a record showing the district court abused its discretion in denying the continuance.

Due to the district court's finding that out-of-state witness problems were foreseeable (and should have been anticipated), the number of continuances previously granted to Father, and Father's failure to show prejudice in denying the continuance, we are persuaded that the district court did not err in its ruling.

CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, Father presents an alternative argument to his claim that the district court erred in overruling Father's motion for continuance. He claims that he received ineffective assistance of trial counsel for his counsel's failure to have Thomas and Fisher properly served with subpoenas to compel their testimony at the termination trial. For its part, the State argues that this issue should not be considered on appeal because Father did not raise the issue of ineffective assistance of counsel in the district court and did not claim an exception to the general rule on appeal. In Father's reply brief he asserts that he has not abandoned this argument. He claims that "[t]here are no factual issues which preclude this Court from reviewing this claim as a matter of law." We disagree.

Generally, issues not raised before the district court may not be raised on appeal. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). However, there are exceptions to this rule. An appellate court may consider an issue not raised in the district court if: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case, (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights, and (3)

the district court's judgment was right for the wrong reason. *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014); see Supreme Court Rule 6.02(a)(5) (2020 Kan. S. Ct. R. 34). Father's justification for our review of this issue appears to fall under the first exception.

Generally, appellate courts will not consider an allegation of ineffective assistance of counsel raised for the first time on appeal. *State v. Salary*, 309 Kan. 479, 483, 437 P.3d 953 (2019). The factual aspects of a claim of ineffective assistance of counsel usually require that the matter be resolved through a request for remand to the district court for an evidentiary hearing. See *State v. Van Cleave*, 239 Kan. 117, 119-21, 716 P.2d 580 (1986) On appeal, Father has not sought a remand to the district court for this purpose.

An appellate court may consider a claim of ineffective assistance of counsel for the first time on appeal only when there are no factual issues and the two-prong ineffective assistance of counsel test can be applied as a matter of law based upon the appellate record. *Salary*, 309 Kan. at 483.

In order to prevail on a claim of ineffective assistance of trial counsel, Father must show "(1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, i.e., that there is a reasonable probability the jury would have reached a different result absent the deficient performance.' [Citations omitted.]" *Salary*, 309 Kan. at 483.

Under both prongs of the ineffective assistance of counsel test it is apparent that our court is not privy to the totality of circumstances surrounding the failure to obtain the two therapists' testimony. For example, we do not know about the prior communications between Father's counsel and the two therapists regarding their proposed trial testimony. Did the therapists initially agree to voluntarily testify or accept a Kansas subpoena, only to suddenly change their minds on the day of trial or be constrained by their attorney's

25

last-minute advice? On the other hand, was Father's counsel previously advised by the two potential witnesses that they would not testify without service of a valid inter-state subpoena and counsel simply failed to process the necessary paperwork to accomplish that service in Missouri? The answers to these two questions are relevant to the determination of whether Father's counsel was ineffective. Without the necessary facts we are left to speculate as to whether the performance of Father's counsel was ineffective.

As to the prejudice prong of the ineffective assistance of counsel test—as mentioned earlier in our discussion of Father's motion to continue—we have no trial testimony or exhibits to show the importance of the therapists' testimony. On how many occasions did they meet with Father? What counseling or treatment was employed to address one or more of Father's diagnoses? Did the therapists have an opinion regarding Father's prognosis? As is readily apparent, the facts necessary to determine whether prejudice resulted from the failure to obtain the therapists' testimony are unknown.

In accordance with our general rule, we decline to review Father's claim that trial counsel was ineffective because the issue is brought for the first time on appeal, and Father has not shown that any of the three exceptions to the general rule are applicable under the totality of circumstances.

Affirmed.